Milton McCRAY, Appellant,

v.

Robert BURRELL, Appellee.

Milton McCRAY, Appellant,

v.

Sergeant V. D. SMITH (Badge No. 153) Md. Penitentiary, Appellee.

James E. X. STOKES, Appellant,

v.

Gerald McCLELLAN, Individually and in his official capacity as Warden of the Maryland Penitentiary, and the Mail Censor, Individually, and in his official capacity as mail censor of the Maryland Department of Corrections, Appellees.

John WASHINGTON, Appellant,

v.

Dr. Harold M. BOSLOW, Director, Patuxent Institution, and Dr. Domingo C. Sorongon, M.D., Patuxent Institution, Appellees.

Nos. 74–1042, 74–1043, 74–1456, 74–1634.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 1, 1974.

Decided April 10, 1975.

Charles F. Morgan, Prisoner Assistance Project, Legal Aid Bureau, Inc., Baltimore, Md. (Michael S. Elder and Michael A. Millemann, Baltimore, Md., on brief), for appellants.

N. Frank Wiggins, National Legal Aid and Defender Association, Washington, D. C. (Robert Plotkin, National Legal Aid and Defender Association, Washington, D. C., on brief), for amicus curiae.

Barbara Gold, Baltimore, Md., American Civ. Liberties Union, Maryland Affiliate, on brief for amicus curiae.

Donald R. Stutman, Asst. Atty. Gen. of Maryland (Francis B. Burch, Atty. Gen. of Maryland, Clarence W. Sharp and Gilbert Rosenthal, Asst. Attys. Gen. of Maryland, on brief), for appellees.

Before HAYNSWORTH, Chief Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL, FIELD and WIDENER, Circuit Judges, sitting in banc.

WINTER, Circuit Judge:

These appeals present the common question of whether a prisoner, incarcerated under state process, is required to exhaust available state remedies before the district court may or should exercise jurisdiction in a suit under 42 U.S.C. § 1983 for the redress of alleged deprivations of civil rights arising out of his incarceration. Some of these appeals were heard but not decided by a panel of the court. Because each presents the same question of exceptional importance,

we consolidated them and heard them in banc.

In No. 74–1042 and No. 74–1043, plaintiff McCray, an inmate of the Maryland Penitentiary, sought relief under § 1983 for deprivations of liberty without due process of law and for imposition of cruel and unusual punishment arising out of two separate incidents in which he was allegedly placed naked in an isolation cell for a period of 48 hours. In No. 74–1042, he sought only compensatory and punitive damages. In No. 74–1043, his inartfully drawn *pro se* complaint may be read to seek injunctive relief as well as damages. Both cases were consolidated in the district court and tried nonjury. The district court dismissed both complaints with prejudice. The district court found that before suing under § 1983, McCray was required to exhaust the state administrative remedy established by the Maryland Inmate Grievance Commission Act, 4A Ann.Code of Md., Art. 41, § 204F (1973 Cum.Supp.), through which he could have obtained relief for the deprivation of his constitutional rights; and that since McCray had not exhausted his remedies under that statute he was not entitled to federal relief. McCray v. Burrell, 367 F.Supp. 1191 (D.Md.1973). On the merits, it found that no constitutional violations had occurred in the incidents alleged; that each defendant in the incident in which he was concerned, had acted in good faith reliance upon standard operating procedures and, hence, was immune from liability in damages.

In No. 74–1456, plaintiff Stokes, another inmate of the Maryland Penitentiary, filed a *pro se* civil rights complaint in the district court alleging that prison officials had violated his first and fourteenth amendment rights by denying him permission to receive and read two national political newspapers, the Gay Liberator and Akwesasne Notes. He sought declaratory relief, injunctive relief and damages, both compensatory and punitive. On defendant's motion, the district court summarily dismissed the complaint for failure to exhaust the available state administrative remedy, relying on the alternative holding in the two *McCray* cases.

In No. 74–1634, plaintiff Washington, an inmate of the Maryland Patuxent Institution, filed a *pro se* complaint under 42 U.S.C. § 1983, alleging that he suffered injuries and deprivations of his constitutional rights as a result of the failure of a prison doctor to provide him with necessary medical care. He demanded a trial by jury, and he sought declaratory relief and compensatory and punitive damages. On the defendant's motion, his complaint was dismissed for failure to exhaust state administrative remedies. The ruling was more in the nature of a summary judgment because the district court received evidence concerning the adequacy of the administrative remedy under the Maryland Inmate Grievance Commission Act as a state administrative remedy for the purpose of exhaustion. The district court found that the Inmate Grievance Commission Act provided plaintiff with a fair and adequate remedy, notwithstanding the inability of the Commission to award damages in an appropriate case. Washington v. Boslow, 375 F.Supp. 1298 (D.Md.1974).

We keenly appreciate the force of the factors identified by the district court in *McCray* and *Washington* as supporting a policy determination that exhaustion of available administrative remedies should be required of prisoners of correctional institutions in Maryland as a prerequisite to a suit under § 1983. We recognize the burden which the increasing flood of prisoner complaint litigation places upon the already overtaxed district courts as well as ourselves. Nevertheless, we are constrained to conclude that the holding that exhaustion is required may be reached only by either legislation conditioning resort to 42 U.S.C. § 1983 upon the exhaustion of available administrative remedies, or by the Supreme Court's re-examination and modification of its controlling adjudications on the subject. Congress has not enacted such legislation. The Supreme Court has not yet

begun a re-examination of its previous holdings and we have no basis on which to predict that it will, or, if so, with what result. We think that we have no alternative but to hold that exhaustion may not be required.

Accordingly, we reverse in Nos. 74–1456 and 74–1634 and remand the cases for determination on the merits. In Nos. 74–1042 and 74–1043, we reach the merits and conclude for reasons hereafter stated that reversal and remand for further proceedings are indicated there also.

## I.

We consider first the question common to all four appeals—whether a prisoner must exhaust available state administrative remedies before a district court may exercise its jurisdiction under 28 U.S.C. § 1343 to adjudicate the merits of a claim under 42 U.S.C. § 1983 that there has been a deprivation of civil rights in prison treatment.

The doctrine of exhaustion of federal administrative remedies has broad application in the law. McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969). Exhaustion of state administrative and judicial remedies is also a familiar doctrine. It is a part of the law of federal habeas corpus both by adjudication, Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944), and cases cited therein, and by statute, 28 U.S.C. § 2254(b).[1] Prior to enactment of the Johnson Act, 28 U.S.C. § 1342, when federal courts reviewed the reasonableness of state rate orders with some frequency, it was held that state judicial remedies must be exhausted before a railroad company could seek to enjoin the enforcement of a rate order of the Virginia State Corporation Commission in a district court. Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908). Exhaustion of state administrative remedies is many times required as a prerequisite to

suits against state officers. See, e. g., Illinois Commerce Commission v. Thomson, 318 U.S. 675, 63 S.Ct. 834, 87 L.Ed. 1075 (1943); First National Bank v. Board of County Commissioners, 264 U.S. 450, 44 S.Ct. 385, 68 L.Ed. 784 (1924).

Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), is the seminal decision with respect to the need for exhaustion in actions brought under 42 U.S.C. § 1983. There, in a suit under § 1983 to redress shocking violations of fourth amendment rights, the claim was made that plaintiffs should have exhausted their state *judicial* remedies before suing in a federal court, but the argument was rejected:

> It is no answer that the State has a law which if enforced would give relief. The federal remedy [§ 1983] is supplementary to the state remedy, and the latter need not be first sought and refused before the federal one is invoked. Hence the fact that Illinois by its constitution and laws outlaws unreasonable searches and seizures is no barrier to the present suit in the federal court. 365 U.S. at 183, 81 S.Ct. at 482.

While Monroe v. Pape constituted no radical departure from the preexisting doctrine of exhaustion of state *judicial* remedies, it was applied two years later in McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), as authority for the proposition that in suits under § 1983 there was also no need to exhaust state *administrative* remedies. In *McNeese*, plaintiffs sought to enjoin racial segregation in an Illinois public school system. The district court granted a motion to dismiss the complaint on the ground that plaintiffs had not exhausted the administrative remedies provided by Illinois law, and the Court of Appeals affirmed on the same theory. In reversing, the Supreme Court

1. Although Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944), and 28 U.S.C. § 2254(b) treat directly only state judicial remedies, Preiser v. Rodriguez, 411 U.S. 475, 491–

92, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), makes clear that exhaustion of state administrative remedies is also required before a federal court may entertain a habeas petition.

called attention to its holding in Monroe v. Pape that one purpose of § 1983 was "to provide a remedy in the federal courts supplementary to any remedy any State might have." 373 U.S. at 672, 83 S.Ct. at 1435. Specifically, it said, "[i]t is immaterial whether respondents' conduct is legal or illegal as a matter of state law. Such claims are entitled to be adjudicated in the federal courts." 373 U.S. at 674, 83 S.Ct. at 1437 (citations omitted). It is true as the district court noted, *McCray*, 367 F.Supp. at 1197, that following this holding the Court also expressed doubt that there was an adequate administrative remedy under Illinois law, and said "[w]hen federal rights are subject to such tenuous protection, prior resort to a state proceeding is not necessary." 373 U.S. at 676, 83 S.Ct. at 1438 (citations omitted). This statement, however, seems nothing more than an alternative ground of decision, not a dilution of the first holding. Certainly it was so understood by Mr. Justice Harlan, the sole dissenter in *McNeese*, 373 U.S. at 676–82, 83 S.Ct. 1433, who expressed as two separate grounds of dissent his views that the doctrine of exhaustion should not be abandoned in that case *and* that Illinois had an available, effective administrative remedy, which should be exhausted before suit was filed under § 1983.

If *McNeese*, as a result of the dual basis of decision, failed to resolve fully the question of prior exhaustion of administrative remedies in § 1983 suits, Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) (per curiam), should have put any remaining doubts to rest. There, the three-judge district court had dismissed a § 1983 complaint for failure to exhaust adequate administrative remedies. In its reversal, the Court cited *McNeese*, with an additional reference to Monroe v. Pape, for the holding that exhaustion of an available administrative remedy is not a prerequisite for an exercise of federal jurisdiction under § 1983. Again, Mr. Justice Harlan dissented, 389 U.S. at 417–20, 88 S.Ct. 526; noting that there

could be no question about the adequacy of the state administrative remedy, he concluded that the Court had, in fact, decided the same issue which confronts us.

The next year, the Court again touched on the question before us. In Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968) (per curiam), a district court's dismissal of a prisoner's § 1983 suit was reversed on the dual grounds that the available administrative remedy was not adequate and that exhaustion was not required. *Houghton*'s principal importance lies in (a) the fact that it was a § 1983 suit by a state prisoner complaining of allegedly illegal prison restrictions, and (b) the interpretation given it in Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam). In the latter, the Court reversed the dismissal of applications for state habeas corpus for failure to exhaust administrative remedies. It was held that exhaustion was not required since the efficacy of the remedy was highly doubtful, but that, as another ground of decision, the applications for habeas, since they sought to attack living conditions and disciplinary measures in a penitentiary and not to effect petitioners' release, should be treated as complaints under § 1983. In § 1983 suits, the Court held exhaustion of state remedies was not required, and "[s]tate prisoners are not held to any stricter standard of exhaustion than other civil rights plaintiffs. Houghton v. Shafer. . . ." 404 U.S. at 251, 92 S.Ct. at 409.

Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972) (per curiam), and Metcalf v. Swank, 406 U.S. 914, 92 S.Ct. 1778, 32 L.Ed.2d 1113 (1972) (mem. op.), are chronologically next in the line of authority. Both were § 1983 suits by welfare recipients. In *Carter*, a judgment dismissing the complaint for failure to exhaust a state administrative remedy was reversed on the ground that exhaustion was not required in this class of cases; and in *Metcalf*, the Court of Appeals was directed to reconsider, in

the light of *Carter*, its affirmance (444 F.2d 1353 (7 Cir. 1971)) of the district court's dismissal of the suit for failure to exhaust adequate state administrative remedies.

In Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), Mr. Justice Brennan, writing for the Court, treated the law as settled in stating that "[w]hen federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) —as they are here—we have not required exhaustion of state judicial or administrative remedies, recognizing the paramount role Congress has assigned to the federal courts to protect constitutional rights." 415 U.S. at 472–73, 94 S.Ct. at 1222. Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), may also be significant, not so much for what it did say, but rather for what it did not say. In *Preiser*, the Court apparently had the opportunity to impose an exhaustion requirement on state prisoner suits under § 1983, and this it failed to do. The original Court of Appeals panel decision directed the prisoner, who had sought to redress his loss of good time as a result of prison discipline in a suit under § 1983 but whose suit was treated as a petition for a writ of habeas corpus, to exhaust state administrative or state judicial processes before he pursued further his claim to federal relief. Rodriguez v. McGinnis, 451 F.2d 730, 732–33 (2 Cir. 1971). In the Supreme Court, the case was decided on the basic premise that the complaint was to be treated as an application for a writ of habeas corpus, where exhaustion clearly applied. As Mr. Justice Brennan, in dissent, noted, "the Court does not graft the habeas corpus exhaustion requirement onto prisoner actions under the Ku Klux Klan Act . . . ." 411 U.S. at 503, 93 S.Ct. at 1843.

From this survey of the pertinent authorities, the law would appear overwhelming that exhaustion of available state administrative remedies is not a prerequisite to maintaining a § 1983 action in a federal court. We recognize, however, that the district courts in the instant cases and in Kochie v. Norton, 343 F.Supp. 956 (D.Conn.1972) (dictum), have sought to read these cases to support the conclusion, as expressed in *Kochie*, that "[n]o decision of the Supreme Court squarely holds that the complaint of a state prisoner, which, if well-founded, is capable of prompt and complete redress by an administrative official, can be brought directly into a federal district court under § 1983 without any attempt at exhaustion of administrative remedies." 343 F.Supp. at 960. Without dissecting their analysis of how the apparent breadth of the language in each of the authorities cited is to be avoided, we are constrained to look at what support, if any, there is to conclude that the Supreme Court has held, or will hold, that exhaustion in these circumstances will be required.

The only authority suggested by the state, but not vigorously pressed, to support the proposition that exhaustion may be required is Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). That was a suit under § 1983 by licensed optometrists to enjoin the conduct of pending proceedings before the Alabama Board of Optometry, the object of which was to revoke their licenses to practice optometry because they practiced their art as employees of other persons or entities. Their principal complaint was that the Board was biased and could not provide them a fair hearing in accordance with the due process clause. A three-judge district court granted an injunction, but it was vacated by the Court and the case remanded for reconsideration in the light of an intervening Alabama Supreme Court case which held that a licensed optometrist was not prohibited by state law from accepting employment from a business corporation.

In reaching this result, the Court considered first the correctness of the district court's decision that it was not required to withhold relief until the license revocation proceedings had been concluded under the normal rule of exhaustion

of administrative remedies. Dealing with this subject, the Court said:

> In the instant case the matter of exhaustion of administrative remedies need not detain us long. Normally when a State has instituted administrative proceedings against an individual who then seeks an injunction in federal court, the exhaustion doctrine would require the court to delay action until the administrative phase of the state proceedings is terminated, at least where coverage or liability is contested and administrative expertise, discretion, or factfinding is involved. But this Court has expressly held in recent years that state administrative remedies need not be exhausted where the federal court plaintiff states an otherwise good cause of action under 42 U.S.C. § 1983 [42 U.S.C.A. § 1983]. McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967). Whether this is invariably the case even where, as here, a license revocation proceeding has been brought by the State and is pending before one of its own agencies and where the individual charged is to be deprived of nothing until the completion of that proceeding, is a question we need not now decide; . . . (footnote eliminated) 411 U.S. at 574–75, 93 S.Ct. at 1695–96.

The Court then concluded, on this point, that since plaintiffs claimed that the administrative proceedings denied them due process of law, so that the remedy was ineffective, adjudication of this claim really required decision of plaintiffs' suit on its merits; therefore, exhaustion would not be required.

The possible significance of the Court's disposition of the exhaustion issue in this manner was pointed up by the separate concurring opinion of Justices Marshall and Brennan in which they joined the Court's opinion "except insofar as it suggests that the question remains open whether plaintiffs in some suits  . .

[under § 1983] may have to exhaust administrative remedies." 411 U.S. at 581, 93 S.Ct. at 1699. They expressed the view that *McNeese, Houghton, Damico* and King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), had settled the question.

We do not think that *Gibson* provides a sufficient precedent to depart from the apparent scope and the literal language of the other Supreme Court cases. The majority opinion recognizes and does not purport to overrule *McNeese* and *Damico*. At most, the statement is a mere introduction to an alternative ground of decision; but, more importantly, it relates to facts quite dissimilar from those in the instant cases. *Gibson* proceeds on the premise that "the individual charged is to be deprived of nothing until the completion of [the state administrative] proceeding" (411 U.S. at 574–75, 93 S.Ct. at 1696)—in short, in *Gibson* the possible harm was *in futuro*. *Gibson*, therefore, is unlike the instant cases where the alleged deprivation of civil right has occurred and may be continuing. Although decided before *Gibson*, Whitner v. Davis, 410 F.2d 24, 28–29 (9 Cir. 1969), recognizes and supports this distinction, as does Toney v. Reagan, 467 F.2d 953, 956–57 (9 Cir. 1972), cert. denied, 409 U.S. 1130, 93 S.Ct. 951, 35 L.Ed.2d 263 (1973). *See also* Raper v. Lucey, 488 F.2d 748, 751 at n. 3 (1 Cir. 1973); Polk v. State Bar of Texas, 480 F.2d 998, 1003–04 (5 Cir. 1973); Stevenson v. Board of Education, 426 F.2d 1154, 1157 (5 Cir. 1970), cert. denied, 400 U.S. 957, 91 S.Ct. 355, 27 L.Ed.2d 265 (1970). The rationale of this distinction—which we need not adopt or reject to decide the cases before us—is that exhaustion may be necessary only when it assures that a decision of state officials depriving plaintiff of a civil right is final, so that the case is ripe for adjudication.

 On balance, therefore, we have repeated expressions by the Supreme Court that exhaustion is not required in cases like the instant ones, and only an indirect expression that exhaustion may be required in certain cases unlike the

instant ones. In this state of the law, it is inappropriate to consider the policy considerations which might dictate a different course of decision. They must be addressed to the Supreme Court, which alone can overrule its prior decisions, or to the Congress, which has authority to amend the statute. Our duty is clear: We must follow the Supreme Court, not attempt to lead it. We must hold that exhaustion is not required.

The plaintiffs argue also that the Maryland Inmate Grievance Commission Act does not provide an effective administrative remedy for their claims. They point out, for example, that the Secretary of Public Safety and Correctional Services is apparently neither bound by the record nor the findings and recommendations of the Inmate Grievance Commission in making final disposition of certain grievances, 4A Ann.Code of Md., Art. 41, § 204F(f)(2). An even more glaring omission in the Act, they argue, is its apparent failure to vest the Commission authority to award damages in an appropriate case. In the light of our conclusion on the exhaustion issue, however, we need not rule on the efficacy of the plaintiffs' administrative remedy.

Our conclusions require us to reverse in Nos. 74–1456 and 74–1634 and remand these cases for further proceedings. We turn to the merits in Nos. 74–1042 and 74–1043.

## II.

McCray's suits against Sergeant Smith, a prison guard at the Maryland Penitentiary, and Captain Burrell, the duty captain in charge of all guards at the Maryland Penitentiary, who described himself as responsible for the entire institution including control and security (but not medical care) of the hospital, arose out of incidents occurring at those institutions on or about November 20, 1971, and January 1, 1972, respectively. The testimony with regard to both incidents was largely conflicting. The district court made extensive findings of fact, resolving questions of credibility,

and we accept those findings. We disagree, however, with the legal conclusions to be drawn therefrom. The facts need not be restated in great detail in view of the district court's detailed recitations in its opinion. *See* McCray v. Burrell, 367 F.Supp. 1191, 1210 et seq.

### A.   *No. 74–1043—McCray v. Smith*

On or about November 20, 1971, McCray was moved from his regular cell because of his complaints about unsanitary conditions. Sergeant Smith, who had never met McCray before, ordered his removal, had him showered and deloused and placed him in another cell on a different tier. The warden instructed Smith to provide McCray with his law books and legal materials which were kept in his regular cell. When they were not provided to him at once, McCray began a substantial vocal disturbance. Additionally, the screaming McCray tore a locker off the cell wall and banged it repeatedly against the wall.

Sergeant Smith determined that McCray should be removed from this cell and placed in the isolated confinement (I.C.) area, cell No. 5. As found by the district court, "this measure was taken to avoid the possibility of causing a greater disturbance among the other inmates." 367 F.Supp. at 1211. While McCray was being removed, again, as found by the district court, he "began shouting insults and threatening to do bodily harm to himself." *Id.* Smith, treating these threats as an indication of mental and emotional instability, directed that McCray be placed in isolated confinement without any clothes or bedding. This was done to protect McCray from harming himself.

McCray was placed nude in the cell about 11:30 a. m., November 20. The cell, itself, was quite long and narrow with a high ceiling. The walls, ceiling and floor were all concrete and there was a one-foot high concrete slab, six to eight feet long and three feet wide, which was McCray's bed. Although, initially, McCray was furnished no blankets

or other bedding, during the night a prison guard gave him a mattress. McCray testified that it was so cold that he tore open the mattress, which was old and deteriorated, and dug a channel down in the cotton so that he could sleep nestled in the mattress. Subsequently, McCray was disciplined for destroying the mattress.

The cell contained a toilet and a sink. The record does not show whether the cell had a window, but evidence was offered that there was a light bulb recessed in the rear wall. The cell had two doors—the inner one composed of bars, and the outer one made of solid wood but not closed. McCray was given no materials with which to clean himself or the cell, and he was fed in plastic cups. He was deprived of reading and writing materials.

The next morning Sergeant Smith returned to check on McCray and found that he had defecated into a cup and smeared feces over himself and the cell wall. Accordingly Smith decided not to return him to his former cell. Instead, he had McCray bathed and the cell scrubbed, and then returned McCray to I.C. cell No. 5 for another twenty-four hours. It was not until that time that Smith caused notice to be given to a psychologist or psychiatrist in accordance with the applicable written administrative directive which had become effective August 10, 1970. The directive stated that "an inmate who is displaying mentally disturbed behavior may be placed in an isolation cell for the inmate's own safety, or that of the inmate population, until the psychologist/psychiatrist is notified . . ." and directed that the *"psychologist/psychiatrist should be contacted immediately after the confinement of the inmate, and the inmate should be evaluated within a twenty-four (24) hour period."* (Emphasis added.) By its terms, the directive permitted the placing of inmates displaying mentally disturbed behavior in a punitive or isolation cell when the institution lacks a mental observation cell and a psychologist or a psychiatrist approves the lodging of such an inmate in an isolation cell.

The next day, November 22, McCray, according to Smith, "started acting alright." He was then returned to his regular cell on the third tier. We infer that McCray's clothes were not returned to him until this time. The record on appeal does not show that he was ever evaluated by a psychologist or a psychiatrist.[2]

### B. *No. 74–1042—McCray v. Burrell*

On or about January 1, 1972, McCray was again removed to another cell. A fire broke out in McCray's cell, according to McCray, accidentally, but in the belief of Captain Burrell, by design. In either event, McCray was burned. Not without difficulty, the guards extinguished the fire and conveyed McCray to the dispensary where, despite McCray's resistance, the nurse on duty treated his burns. The nurse suggested that McCray remain in a locked cell in the hospital. At a later date, McCray was disciplined for setting fire to his cell.

Captain Burrell, who was present when McCray was treated, not unreasonably believed that McCray had set the fire. Since he concluded that McCray was mentally unstable, he decided, despite the nurse's suggestion, to place McCray in a mental observation (M.O.) cell, again without clothes or a mattress or other bedding. McCray was placed in the M.O. cell at about 9:45 a. m., January 1, and released about 8:00 a. m., January 3. At about the time he was treated in the dispensary, the nurse, purportedly acting in accordance with the written directive to which reference has been made, contacted a physician and informed him that McCray was placed in M.O. The physician told her to commu-

---

**2.** Sergeant Smith implied that the psychologist, one Dr. Musk, did see McCray. Dr. Musk testified that he could not report whether he had talked to McCray at this time. He said he would "most probably" have recorded such a visit, but often did not.

nicate with another doctor, whom she was unable to reach, and McCray was not seen by a physician until January 4, 1972.

The M.O. cell in which McCray was placed was described by Captain Burrell as a bare cell. The windows were covered with sheet metal, but the cell had an electric light. The cell had concrete walls, a concrete ceiling, and a tile floor. There was no sink, and the only sanitary facility was an "oriental toilet"—a hole in the floor, six to eight inches across, covered by a removable metal grate which was encrusted with the excrement of previous occupants. The "toilet" flushed automatically once every three to five minutes. McCray was not permitted to bathe, shave or have or use articles of personal hygiene, including toilet paper. He was not afforded reading or writing materials. He claimed that during the forty-six hours he spent in this confinement "it was impossible to sleep . . . I stood up most of that [first] night, the floor was cold."

### III.

■ The district court held that plaintiff's confinement "in both cases for forty-eight hours was not an unreasonable period when one considers the surrounding circumstances in each case," 367 F.Supp. at 1215, and that "the defendant's actions were not excessive exercises of authority beyond the limits of civilized standards of decency . . . they [were not] intended as punishment for the plaintiff's conduct . . . they were employed as precautionary measures . . . the removals . . . to isolated cells were not pointless impositions of suffering . . . there [was not] a less severe alternative that would have achieved the purposes for which the confinement was imposed," 367 F.Supp. at 1216. While we accept the district court's findings that McCray's confinements in isolated cells were not intended as punishment but for mental observation and as a precaution against a not unreasonable fear that McCray might harm himself, we are constrained to con-

clude that McCray's eighth amendment right not to be subjected to "cruel and unusual punishments" was violated.

■ As articulated in Trop v. Dulles, 356 U.S. 86, 100–01, 78 S.Ct. 590, 597, 2 L.Ed.2d 630 (1958), "[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man," therefore the punishment imposed must be justified in light of the "evolving standards of decency that mark the progress of a maturing society." The eighth amendment is, of course, made applicable to the states through the fourteenth amendment. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972); Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947).

■ It may be argued that, if the findings of the district court are accepted, McCray's claims do not raise eighth amendment questions, because McCray was isolated not for purposes of punishment but for the more humane and not unreasonable purpose of protecting him from self-harm, until an expert evaluation of his mental condition could be made and proper therapeutic steps taken if they were indicated. But the answer is that isolation of McCray occurred within a prison context. His jailers had the power to isolate him because he had been committed to their custody as punishment imposed pursuant to a judicial determination that he had engaged in criminal conduct. His confinement, in whole and in part, was punishment for his misdeeds. Thus, all of his confinement was subject to the restrictions of the eighth amendment. *Cf.* Howard v. Smyth, 365 F.2d 428, 429–30 (4 Cir. 1966), cert. denied 385 U.S. 988, 87 S.Ct. 599, 17 L.Ed.2d 449 (1966). If anything, the fact that McCray was isolated within the prison for nonpunitive purposes strengthens his case because special disciplinary reasons may not be offered in possible justification for the conditions in which he was kept.

■ A. In McCray's suit against Smith, we think that a violation of the

368

eighth amendment has been shown.[3] The conditions of confinement in I.C. cell No. 5 came perilously close to a denial of eighth amendment rights in and of themselves, but the record is not sufficiently complete that we rest our decision on this ground. The cell did contain a toilet and a sink, although we do not know if either could be operated by McCray from within the cell or whether a guard was available to render them operative where their use was indicated. McCray was deprived of essential articles of hygiene, although conceivably there could have been a good faith belief that he might harm himself if permitted access to such seemingly innocuous articles as a bar of soap or a toothbrush. McCray was also deprived of heat, clothes and blankets, and he was furnished only a deteriorated mattress in which he scooped out a resting place for himself. The record, however, does not disclose the temperature in McCray's cell or whether McCray was able to capture adequate sleep under these primitive conditions.

What is clear, however, is that if McCray's mental condition was reasonably believed to be so suspect as to justify the conditions we have described, then it was such as to warrant, if not the actual ministrations of professional personnel, an immediate effort to gain him prompt medical evaluation and necessary treatment. The written directive for operation of the place of confinement states specifically that when an "inmate who is displaying mentally disturbed behavior" is "placed in an isolation cell for the inmate's own safety, or that of the inmate population," the "psychologist/psychiatrist should be contacted im-

*mediately* after confinement of the inmate, and the inmate should be evaluated within a twenty-four (24) hour period" (emphasis added). Evidently McCray was never examined during this confinement, but Sgt. Smith can hardly be held as a guarantor that the psychologist/psychiatrist whom he does not command will carry out his duties under the directive. Sgt. Smith, however, is accountable for his duty to notify, or to cause to be notified, the psychologist/psychiatrist *immediately* after McCray's isolation. By his own admission, Smith did not seek expert professional help until nearly twenty-four hours after he isolated and stripped McCray.

█ On this record, we conclude that McCray's conditions of confinement *per se* do not mount up to a denial of his rights under the eighth amendment. We have do doubt that a prisoner evidencing mental derangement in a form suggestive of self-harm or harm to others may and should be removed from the general prison population until his true condition can be assayed by those competent to evaluate him; and, until his examination and the formulation of an expert opinion, he may be subjected to protective measures. In permitting such confinements, the prison directive comports with the eighth amendment. But, when the protective measures take the form of isolation, nude, in I.C. cell No. 5, we believe also that the administrative directive states the constitutional minimum in requiring that a "psychologist/psychiatrist . . . be contacted immediately after the confinement of the inmate, and the inmate . . . evaluated within a twenty-four (24) hour

---

**3.** We perceive that two tests for violations of the eighth amendment are relevant in the cases before us. First, are the conditions of punishment sufficiently "shocking" that they amount to "cruel and unusual" punishment? *See, e. g.,* Landman v. Royster, 354 F.Supp. 1302, 1318 (E.D.Va.1973). Second, does the punishment constitute some rational means to reach a permissible end or is it, instead, arbitrary, Howard v. Smyth, 365 F.2d 428, 431 (4 Cir. 1966), unreasonable, Almond v. Kent, 459

F.2d 200, 204 (4 Cir. 1972), or unnecessary, Weems v. United States, 217 U.S. 349, 370, 30 S.Ct. 544, 54 L.Ed. 793 (1910)? The district court phrased this second test as requiring that there not be "a less severe alternative that would have achieved the purposes for which the confinement was imposed," 367 F.Supp. at 1216, and its phraseology does not seem inaccurate to us. *See also* Landman v. Royster, 333 F.Supp. 621, 645 (E.D.Va.1971).

period." If compliance with the directive is not forthcoming, the guarantee of the eighth amendment has been denied, and, as we shall presently hold, if expert medical help is not forthcoming within a reasonable period of time, the deprivations, discomforts and suffering resulting from such confinement must be alleviated and less barbarous means of protection must be provided.

█ B. In McCray's suit against Burrell, we perceive two violations of the eighth amendment. First, the record reveals that the conditions of confinement in the mental observation (M.O.) cell in which McCray was kept fall far short of the current standards of decency of present-day society. McCray was kept naked in a barren cell without blanket or mattress and with nowhere to sit, lie or lean except against bare concrete or bare tile. He had no sink or running water; his only toilet was a hole in the floor, the cover of which was encrusted with human excrement. He was denied all articles of personal hygiene.[4] Society would hardly tolerate such confinement for a suspected mental patient, not convicted of crime; we cannot conceive that decent society would tolerate it even for a suspected mental patient who had been convicted of crime. The conditions of this confinement constitute a *per se* violation of the eighth amendment. *See* Landman v. Royster, 354 F.Supp. 1302 (E.D.Va.1973); Landman v. Royster, 333 F.Supp. 621 (E.D.Va.1971).

█ The second violation is identical to the violation in McCray's case against Smith—noncompliance with the constitutionally minimum requirements of the written directive concerning isolation of mentally disturbed inmates. As found by the district court, Captain Burrell took steps to comply with the institution's written directive to obtain promptly the services of an expert to evaluate McCray's condition at or about the time that he ordered McCray's special confinement. Like Sergeant Smith, Captain Burrell was not a guarantor that the expert attention would be immediately forthcoming, and it may well be that, as suggested by the district court, the directive was not fully carried out because McCray's second confinement occurred over the New Year's Day holiday. But Captain Burrell was not just a prison guard; he was captain of the guards. Even if we assume that the conditions of isolated confinement were constitutionally permissible, it was incumbent on Captain Burrell, if expert medical attention was not forthcoming in a reasonable period of time, to devise and employ means to protect McCray from injury to himself other than continued isolation with deprivation of clothing and elements of personal hygiene.

## IV.

Although in the McCray cases we conclude that the treatment afforded McCray amounted to a denial of his rights under the eighth amendment, it does not necessarily follow that McCray is entitled to damages and injunctive relief against Smith or that he is entitled to an award of damages against Burrell. The district court held that "since the defendants, as shown from all the facts, acted in good faith in exercising their discretion . . . they are immune from suit under 42 U.S.C. § 1983." 367 F.Supp. at 1217. Although the cases must be remanded, we do not foreclose the possibility that both Smith and Burrell may again be held immune from damages.

---

**4.** Many other cases have singled out the deprivations suffered by McCray in overall holdings that cell conditions violate the eighth amendment: unsanitary cell conditions and lack of items with which to clean oneself, LaReau v. MacDougall, 473 F.2d 974, 978 (2 Cir. 1972), cert. denied, 414 U.S. 878, 94 S.Ct. 49, 38 L.Ed.2d 123 (1973); inadequate heat, Wright v. McMann, 460 F.2d 126, 129 (2 Cir. 1972); Landman v. Peyton, 370 F.2d 135 (4 Cir. 1966); two and one-half days of isolated confinement, Knuckles v. Prasse, 302 F.Supp. 1036, 1062 (E.D.Pa.1969), aff'd per curiam, 435 F.2d 1255 (3 Cir. 1970), cert. denied, 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971), reh. denied, 404 U.S. 877, 92 S.Ct. 33, 30 L.Ed.2d 125 (1971).

■ Our prior decisions establish that when a prison guard acts in reliance on a good faith belief that what he is doing is constitutionally permissible, he is immune to damages as a consequence of his action even if it should be later established that his belief was ill-founded. Skinner v. Spellman, 480 F.2d 539 (4 Cir. 1973). *Cf.* Eslinger v. Thomas, 476 F.2d 225 (4 Cir. 1973); Hill v. Rowland, 474 F.2d 1374 (4 Cir. 1973). In applying the test, however, the district court seemed to conclude that because the defendants appeared to have complied with both the substance of the written directive with regard to the isolation of prisoners suspected of mental illness and the "normal operating procedure" of removing the clothing of "a prisoner who had exhibited an unstable mental and emotional state," 367 F.Supp. at 1217, immunity to damages followed as a matter of course. We do not perceive that the immunity doctrine may be applied in this fashion. Additional findings must be made before it may be properly concluded that defendants are immune, and it may be necessary to adduce additional evidence for those findings to be made.

■ Most important, defendants may not avail themselves of the defense until they have proved that they had a good-faith belief in the legality of what they did. Since what is sought to be proved is a matter of defense, the burden of proof is upon them. In order to sustain that burden, we perceive certain subsidiary facts that must be established.

■ A. In the case of Smith, first, a satisfactory explanation must be offered of his directions that McCray be isolated in the I.C. area, rather than an M.O. cell. It is true that the written directive permitted a disturbed prisoner to be isolated in an I.C. cell in an institution which was lacking M.O. facilities, but it appears that McCray's subsequent isolation by

Burrell was in an M.O. cell, albeit one more primitive than the I.C. cell in which Smith placed McCray, so that it can be inferred that the Maryland penitentiary was not an institution lacking in M.O. facilities.

■ Second, the written directive, purportedly followed by Smith, explicitly stated that the "psychologist/psychiatrist should be contacted *immediately* after confinement of the inmate, and the inmate should be evaluated within a twenty-four (24) hour period" (emphasis added). As we have said, Smith cannot be held to the requirement of evaluation within twenty-four hours, but this provision gives meaning to the use of the word "immediately" in the preceding clause, and the record is clear that Smith took no steps to notify a psychologist or psychiatrist until the initial twenty-four hours of confinement had almost expired. In order to avail himself of the defense, it will therefore be incumbent on Smith to present proof which establishes by a preponderance of the evidence that the time within which he gave the notice complied with his reasonable understanding of the adminsitrative direction of "immediately." [5] In this connection, the district court found that prison procedures required Smith to notify his superior immediately after isolating an inmate and that Smith was not shown to have failed to notify his superior. The district court misplaced the burden of proof. The immunity defense is for Smith to prove, not McCray to disprove.

B. In Burrell's case, we have held that the conditions of the M.O. cell in which McCray was confined were *per se* such as to violate the eighth amendment. But this is not to say that if Burrell had a good-faith belief that he was acting legally in placing McCray in the M.O.

---

**5.** On remand the evidence may show that Smith discharged his duty by notifying a superior whom he reasonably expected would properly notify a psychologist or psychiatrist. Indeed, it may even appear that the superior gave such notice. In either event, if the proof

further shows that standard operating procedures of the prison permitted this form of notification as compliance with the administrative directive, Smith could still be immunized from liability by the defense.

cell, he was liable for damages for this violation. However, Burrell's good faith in this regard remains to be established if liability is to be avoided.

We have also held that the eighth amendment was violated when the administrative directive was not followed. But Burrell may not be responsible for this noncompliance. The district court must examine the scope of Burrell's duties and the extent of his responsibilities and determine that they were fully met before liability may be excused. This will include a consideration of the following, among others: Did Burrell have a continuing duty toward McCray after placing him in an M.O. cell? If so, did he have a duty to determine that a psychiatrist or psychologist had in fact been summoned? What duty, if any, did Burrell have when a psychiatrist or a psychologist failed to respond in a reasonable period? Were there other, more humane facilities to which McCray could have been transferred when a psychiatrist or psychologist failed to respond?

## V.

Finally, we consider McCray's contention that he was improperly denied a jury trial in his suits against Smith and Burrell. We perceive no error.

McCray made no demand for a jury trial when he filed his *pro se* complaints on January 19, 1972, and February 9, 1972, in No. 74–1042, and on March 7, 1972, in No. 74–1043. Counsel was appointed to represent him in March 1972 and substitute counsel was appointed on or about December 8, 1972. The first request by McCray for a jury trial was made orally in open court on June 11, 1973.

McCray's request was both untimely and not in writing as required by Rule 38(b), F.R.Civ.P. As such, it constituted a waiver of trial by jury, Rule 38(d). Of course the district court had discretion to grant the request, in whole or in part, notwithstanding, Rule 39(b), but we cannot say that there were

such exceptional circumstances that the failure to grant the oral motion was an abuse of discretion. General Tire & Rubber Co. v. Watkins, 331 F.2d 192, 197–98 (4 Cir. 1964), cert. denied, 377 U.S. 952, 84 S.Ct. 1629, 12 L.Ed.2d 498 (1964).

Accordingly, in Nos. 74–1042 and 74–1043, we reverse the judgments of the district court and remand the cases for further proceedings in accordance with the views expressed herein.

Reversed and remanded.

### Addendum

Since the preparation of the majority opinion, the Supreme Court has decided Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), a case having relevance to Part IV of our opinion dealing with the defense of official immunity. *Wood* concerned the immunity of school officials to suits for damages under 42 U.S.C. § 1983 brought by students who claimed that they had been disciplined in violation of their constitutional rights. The holding that school officials are entitled to qualified immunity proceeded as an extension and application of Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); and Scheuer v. Rhodes, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The conditions under which immunity could be properly invoked were described as follows:

> The official must himself be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice. To be entitled to a special exemption from the categorical remedial language of § 1983 . . . a school board member . . . must be held to a standard of conduct based not only on permissible intentions, but also on

knowledge of the basic, unquestioned constitutional rights of his charges. . . . [A] school board member is not immune from liability for damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with malicious intention to cause a deprivation of constitutional rights or other injury to the student. . . . A compensatory award will be appropriate only if the school board member has acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. 420 U.S. at 321, 95 S.Ct. at 1000.

We think that what is said on the subject in the main opinion is consistent with *Wood,* and that *Wood* constitutes additional authority for the conclusions reached therein.

FIELD, Circuit Judge (concurring and dissenting):

While I cannot quarrel with the conclusion of the majority that on the present state of the law we have no alternative but to hold that exhaustion may not be required in a suit under 42 U.S.C. § 1983, in all deference, I cannot agree with its reversal of the district court on the merits of McCray's cases. To my mind this action of the majority is an incredible and unjustified judicial intrusion upon the right of the Maryland authorities to take reasonable disciplinary measures to maintain some semblance of order in their penal institutions, and arbitrarily discards the well documented decision of the district judge which was reached after a full and complete evidentiary hearing.[1]

It occurs to me that far from intruding upon the Eighth Amendment rights of McCray, Smith and Burrell conducted themselves in a reasonable manner and with admirable restraint under the circumstances. As the majority notes, the genesis of the Smith incident was McCray's request that he be moved from his regular cell because of its unsanitary condition. Sergeant Smith acceded to the request and had McCray showered and deloused and placed in another cell. When Smith did not immediately comply with McCray's imperious demand that his law books and legal materials be brought to his new cell, McCray created a substantial disturbance, screaming and tearing a locker off the wall and banging it repeatedly against the cell wall. It was then that Smith decided to remove McCray from the South Wing and place him in the isolated cell area, and the district judge specifically found that "[c]learly this measure was taken to avoid the possibility of causing a greater disturbance among the other inmates." Assuredly, this was not an unreasonable step on Smith's part nor was his decision to strip McCray and remove the mattress from the I.C. cell unreasonable in the light of McCray's shouted threats to do bodily harm to himself. On the following morning when Smith discovered that McCray had smeared himself and his cell with his own fecal matter, Smith did not leave him in this deplorable condition but dutifully had McCray showered and

1. The majority cites this court's opinion in Landman v. Peyton, 370 F.2d 135 (1966). In that case which involved the solitary confinement conditions in the Virginia State Penitentiary, the evidentiary hearing conducted by the district court disclosed, among other things, that the prisoners in such confinement subsisted on a diet of bread and water for two days, were deprived of all items for personal hygiene, and that the authorities resorted to the use of tear gas twelve to fifteen times in the course of a year. The district court concluded that all of this was done in the legitimate exercise of disciplinary authority. Writing for this court, Judge Sobeloff was highly critical of the Virginia authorities. However, he concluded that since the case came to us on conflicting testimony, we were not prepared to say that the findings of the district judge were clearly erroneous. It occurs to me that the findings and conclusions of Judge Northrop in the present case should be accorded similar respect.

the cell scrubbed before returning him to the cell for another twenty-four hours. Under the circumstances, I hardly see how this or any other court could conclude that McCray had been treated in such a "base, inhuman and barbaric" manner that it violated his Eighth Amendment rights.[2]

In the Burrell case McCray had set his cell on fire, intentionally or otherwise, and thereafter used a metal cabinet to first break the sink and then the toilet in what the district court characterized as an "alleged effort to allow the water to flow more freely." · The guards extinguished the fire and took McCray to the dispensary where his burns were treated by a nurse despite McCray's abusive resistance. Burrell, not unreasonably, viewed McCray's conduct as evidence of mental instability and, accordingly, placed him in a mental observation cell after removing his clothes and mattress to protect him from possible self-injury. As stated by the majority, McCray was allowed to remain in the M.O. cell for approximately forty-eight hours before being returned to his regular cell.

Upon the evidence relative to these two incidents the district court specifically concluded that McCray had been placed in isolation "to avoid the possibility of continued disruptions that might involve substantial portions of the South Wing." The court further stated:

"It is important to bear in mind that the Maryland Correctional System, like many others, has been plagued by considerable prisoner unrest. While this Court is not absolving the prisons of all responsibility for this problem, it is clear that a prison correctional officer must be concerned with avoiding situations which could ignite a riot. *This was the principal factor considered by the defendants in placing the plaintiff in an isolated cell.*" (Emphasis added) 367 F.Supp. at 1213–1214.

The district judge found that none of these events constituted an arbitrary and capricious punishment of McCray, and the majority concedes that he applied the appropriate criteria to the evidence when he observed:

"The Court concludes that the defendants' actions were not excessive exercises of authority beyond the limits of civilized standards of decency. *See* Trop v. Dulles, 356 U.S. 86, 100–101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Nor were they intended as punishment for the plaintiff's conduct, but as has been repeatedly stated, they were employed as precautionary measures. The removals of the plaintiff from his cell on the South Wing to isolated cells were not pointless impositions of suffering, nor was there a less severe alternative that would have achieved the purposes for which the confinement was imposed. Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 2747, 33 L.Ed.2d 346 (1972)." 367 F.Supp. at 1216.

To bolster its position in both cases, however, the majority has seized upon an institutional directive which stated that "an inmate who is displaying mentally disturbed behavior may be placed in an isolation cell for the inmate's own safety, or that of the inmate population, until the psychologist/psychiatrist is notified * * *" and directed that the "psychologist/psychiatrist should be contacted immediately after the confinement of the inmate, and the inmate should be evaluated within a twenty-four (24) hour period." Since, to some degree at least, the treatment accorded McCray was based upon the apprehension that he might be mentally dis-

---

2. With respect to the cell conditions the district court made the following observation:

"The physical aspects of the cells in the isolated cell area and the mental observation area (which are substantially the same) are primitive at best. However, it is significant that the plaintiff candidly admitted on sever-

al occasions he had requested to be placed in the I.C. area because it was more conducive to preparation of legal papers. While it is true that he was fully clothed on these latter visits to I.C., it does indicate that the conditions of the cells were not intolerable." 367 F.Supp. at 1216.

turbed, the majority concludes that the failure of Smith and Burrell to call expert medical help within the period prescribed by the directive in itself violated McCray's Eighth Amendment rights, and states that "if expert medical help is not forthcoming within a reasonable period of time, the deprivations, discomforts and suffering resulting from such confinement must be alleviated and less barbarous means of protection must be provided."

First of all, this somewhat novel constitutional pronouncement utterly ignores the finding of the district judge that the *principal* reason for McCray's isolation was to insulate the other inmates of the South Wing from the potentially dangerous and disruptive consequences of McCray's outrageous and flagrant misconduct, including what the district judge found was his attempt "to burn his cell, and possibly the entire South Wing." Concededly, an agency must comply with its own regulations,[3] and had McCray sustained any injury as a result of the failure to provide timely medical care, arguably the directive might have furnished a basis for a negligence action by him.[4] The fact is, however, he required no such medical attention, and I am unaware of any constitutional principle which requires or justifies the incorporation of such an institutional directive into the Bill of Rights.

We are not dealing here with the arbitrary and pervasive pattern of conduct which Judge Merhige found in the Virginia penal system, Landman v. Royster, 354 F.Supp. 1302 (E.D.Va.1973); Landman v. Royster, 333 F.Supp. 621 (E.D. Va.1971); nor are the facts of this case at all similar to the prolonged confinement in the "strip cells" of Dannemora which confronted the Second Circuit in Wright v. McMann, 387 F.2d 519 (1967). There is not even a suggestion that McCray was being arbitrarily punished for attempting to exercise any of his constitutional rights, *cf.* Howard v.

Smyth, 365 F.2d 428 (4 Cir. 1966). Regrettably, it appears to me that when the decision of the majority is read in the light of the record in this case, it is tantamount to a declaration that in this circuit the Eighth Amendment proscribes any substantial disciplinary action by prison authorities no matter how extreme and disruptive the misconduct of the inmate may be. In my opinion we would better serve the interests of justice and orderly prison administration by heeding the admonition of Judge Kaufman in Sostre v. McGinnis, 442 F.2d 178, 190–191 (2 Cir. 1971):

"For a federal court, however, to place a punishment beyond the power of a state to impose on an inmate is a drastic interference with the state's free political and administrative processes. It is not only that we, trained as judges, lack expertise in prison administration. Even a lifetime of study in prison administration and several advanced degrees in the field would not qualify us *as a federal court* to command state officials to shun a policy that they have decided is suitable because to us the choice may seem unsound or *personally* repugnant." (Emphasis in original.)

McCray is no stranger to the district court of Maryland, having filed thirty-six suits in that forum in the three years prior to the cases here in question. Additionally, the records of our clerk reflect that fourteen appeals by McCray have been placed on the regular docket of this court during the past three years. The only conclusion that can reasonably be drawn from McCray's litigious history is that he is a chronic troublemaker and malcontent who is engaged "in a ceaseless barrage of frivolous civil suits at public expense based upon allegations that have been repeatedly found meritless." Daye v. Bounds, 509 F.2d 66 at 69 (1975). We can rest assured that if it accomplishes nothing else, the decision of the majority in these cases will encour-

---

3. *See,* United States v. Heffner, 420 F.2d 809 (4 Cir. 1969).

4. *See* Church v. Hegstrom, 416 F.2d 449 (2 Cir. 1969).

age McCray and other prisoners of a similar disposition to flaunt prison authority, continue their disruptive conduct in the institution, and clog the docket of the district court with more frivolous litigation. In a prefatory observation in his opinion in these cases Judge Northrop noted that almost 31% of prisoner appeals filed nationwide were filed in the Fourth Circuit in fiscal 1972 and that this percentage increased to 36.1% during the first half of 1973. More importantly, he noted, such cases accounted for 38% of all cases filed with the Fourth Circuit in 1972 and for 45.3% for the first half of 1973. I discern something more than a mere coincidental correlation between these disturbing statistics and the philosophy of judicial lenity evidenced by the majority in these cases of McCray.

Circuit Judge DONALD RUSSELL authorizes me to say that he joins in this opinion.

WIDENER, Circuit Judge (concurring and dissenting):

With deference to the majority, I agree with the opinion of Judge Field and I would add a few words.

I

Although the majority opinion recites that it accepts the findings of fact of the district judge, it promptly discards the inferences made by him which are as much a part of his findings as the naked facts themselves. This I do not believe an appellate court has the authority to do, much less ought to do. F.R.C.P. 52(a); Commissioner v. Duberstein, 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960); United States v. Gypsum Company, 333 U.S. 364, 394–95, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Piedmont Minerals Company v. United States, 429 F.2d 560, 562 (4th Cir. 1970); Glasscock v. United States, 323 F.2d 589 (4th Cir. 1963); Wilsey-Bennett Trucking Company v. Frost, 275 F.2d 144, 147 (10th Cir. 1960).

II

With respect to the question of exhaustion of administrative remedies, I concur in the result solely because of Part II of Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), and not for the reasons given by the majority.

As the majority properly recognizes, Monroe dealt with state judicial, and not administrative, remedies. In McNeese, there was an administrative procedure but no real administrative remedy. As the court stated, "The Superintendent himself apparently has no power to order corrective action. In other words, his 'only function . . . is to investigate, recommend and report. . . . [He] can give no remedy. . . .'" 373 U.S. at 675, 83 S.Ct. at 1437.

In Damico, the court apparently moved away from the more narrow ruling of McNeese and construed that case to hold that administrative remedies in suits under 42 U.S.C. § 1983 need not be exhausted although adequate. This ruling was underscored by Houghton, a prisoner's case in which the prisoner sought legal materials. The court noted, however, that it seemed likely that the administrative remedy was futile, and then, in an alternative holding, stated that resort to administrative remedies was unnecessary. 392 U.S. at 640, 88 S.Ct. 2119. The matter stood here at the time of Wilwording v. Swenson, another prisoner's case challenging living conditions and disciplinary measures in 1971. Part II of that opinion took up the question of exhaustion in a prisoner's case brought under § 1983, and the court reaffirmed its holding in Houghton that in any event resort to administrative remedies was unnecessary. 404 U.S. at 252, 92 S.Ct. 407.

But the Houghton decision was based on the reasoning that "state prisoners are not held to any stricter standard of exhaustion than other civil rights plaintiffs." 404 U.S. at 251, 92 S.Ct. at 409. And the opinion noted the "probable futility" of administrative remedies in Houghton, 404 U.S. at 252, 92 S.Ct. 407.

Wolfe v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), however, held, rather than recited, that the rights of a state prisoner under § 1983 are not coextensive with those of any other person, and the court stated: "Of course, as we have indicated, that a prisoner retains rights under the Due Process Clause in no way implies that this right is not subject to restrictions imposed by the nature of the regime to which he has been lawfully committed. . . . (citations omitted). Prisoner disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply. . . . (citations omitted). In sum, there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." 418 U.S. at 556, 94 S.Ct. at 2975. The rule, as pointed out in the dissenting opinions, created a separate class for prisoners.

Further erosion of the absolute rule which some consider to have existed is shown by the concurring opinion of Mr. Justice Marshall in Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1974), in which he stated that he joined the opinion of the court "except insofar as [the suggestions] that the question remains open whether plaintiffs in some suits brought under 42 U.S.C. § 1983 may have to exhaust administrative remedies." 411 U.S. at 581, 93 S.Ct. at 1699. *Gibson* was a suit under 42 U.S.C. § 1983 concerning the practice of optometry in Alabama, and the opinion of the court stated that whether exhaustion of administrative remedies in such a matter was "invariably the case" "is a question we need not now decide." 411 U.S. at 574, 575, 93 S.Ct. at 1696.

Thus, Gibson v. Berryhill may be read to *hold* that the question of exhaustion of administrative remedies is at least a partially open question.

Further erosion of the exhaustion rule is found in the very recent case of Huffman v. Pursue, 420 U.S. 592, 95 S.Ct 1200, 43 L.Ed.2d 482 (1975). That case held, in a suit brought in a district court to enjoin a common nuisance proceeding in a State court, where judgment had been entered in the State court but the losing party had not appealed in the State system, rather going directly to the federal district court, that "a party in appellee's posture must exhaust his state appellate remedies before seeking relief in the District Court, unless he can bring himself in one of the exceptions specified in *Younger* [v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669]." at 608, 95 S.Ct. at 1210. The importance of the ruling is that it shows definitely that the all embracing rule of non-exhaustion in all § 1983 cases is no longer the law, for this, and the holding in *Wolfe*, are direct holdings that, first, prisoners' rights are special cases, and, second, exhaustion may be required in some circumstances although the basis of the suit is under 42 U.S.C. § 1983. Indeed, the dissent of Mr. Justice Brennan in *Huffman* describes the majority ruling as "an obvious first step toward discard of heretofore settled law that such actions may be maintained without first exhausting state judicial remedies." at 613, 95 S.Ct. at 1212.

Although not decided under 42 U.S.C. § 1983, Schlesinger v. Councilman, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), has further eroded the all embracing rule. It held that where a serviceman is charged with crimes by military authorities and could "show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise." at 758, 95 S.Ct. at 1313. And the court concluded ". . . we discern nothing that outweighs the strong considerations favoring exhaustion of remedies or that warrants intruding on the integrity of military court processes." at 761, 95 S.Ct. at 1315. At p. 756, 95 S.Ct. at 1312, the court had compared the policy rules of exhaustion in habeas corpus and non-intervention in State criminal proceedings with exhaustion of administrative remedies.

To this date, the Court has not been faced with a fact situation similar to the one at hand, that is to say, with a state statute providing an administrative remedy which, if not entirely adequate, is so nearly so that the deferral of only a small part of the relief sought would not impinge on the rights of the plaintiff in any significant manner.

There is assuredly no policy reason for the courts not to apply the customary and general law of requiring exhaustion of administrative remedies merely because a case is brought under 42 U.S.C. § 1983. This is conclusively shown by the exhaustion doctrine developed with reference to habeas corpus cases. Surely, liberty is our most precious right, all others paling into insignificance beside it. And the protection of liberty in the last analysis is by writ of habeas corpus, which is specifically recognized in the Constitution and there protected from suspension except when in cases of rebellion or invasion the public safety may require it. U. S. Constitution, Article II, § 9. In the face of the liberty interest protected, for the sovereign in the last analysis may only impose his will on the citizen by confinement, the courts nevertheless developed an exhaustion requirement in habeas corpus cases as early as 1886 in Ex parte Royall, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886), which was followed by a series of cases as late as Ex parte Hawk, 321 U.S. 114, 64 S.Ct. 448, 88 L.Ed. 572 (1944). The exhaustion doctrine was then codified in 1948 in 28 U.S.C. § 2254. Since no policy reason exists against exhaustion in protecting the liberty interest as shown by the decisions of the Supreme Court, I can find no policy interest which exists against an exhaustion requirement respecting conditions of confinement. If exhaustion is required to test the legality of the fact of confinement, what policy should require non-exhaustion when testing the conditions of confinement?

It follows that I would affirm other than on account of that part of part II of *Wilwording* which has not been modified.

Circuit Judge DONALD RUSSELL authorizes me to say that he joins in this opinion.