**Gregory H. O'CONNOR, Plaintiff,**

v.

**Gerald KELLER, Superintendent; W. McGinley; O. H. Wachtell; L. E. Mitchell; K. M. Robinson; S. R. Showe; E. C. Pfister, Jr.; J. O. Harne; J. R. Fisher; J. E. Houck; A. Schetrompf; R. L. Smallwood; Captain Spickler; Lieutenant Shinham; R. Anderson; and C. E. Sweigert, III, Maryland Correctional Institution, Defendants.**

Civ. No. M–78–2204.

United States District Court, D. Maryland.

March 26, 1981.

Thomas L. Crowe and Juliet A. Eurich, and Cable, McDaniel, Bowie & Bond, Baltimore, Md., for plaintiff.

Stephen H. Sachs, Atty. Gen., Donald R. Stutman and Alice G. Pinderhughes, Asst. Attys. Gen., Baltimore, Md., for defendants.

JAMES R. MILLER, Jr., District Judge.

In this action, Gregory H. O'Connor, who at all pertinent times was a prisoner at the Maryland Correctional Institution (MCI) in Hagerstown, Maryland, has alleged that his constitutional rights were abridged by certain employees of the institution in the fall of 1978. He has requested compensatory and punitive damages based upon the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### The Facts

#### I. *The Search and the F–1 Tier Area*

On the evening of September 29, 1978, the plaintiff was confined on Tier F–1, a general population tier, in Cell 17 with his cellmate, Anthony Cooper. The door to Cell 17 opened at approximately 10 minutes to 9 p. m., and defendants McGinley and Pfister came down the tier to Cell 17. McGinley and Pfister, both correctional officers, were assigned as "standby officers" on the 4 p. m. to 12 p. m. shift. They had been ordered to conduct a search of the cell for contraband, specifically sandpaper. They ordered O'Connor and Cooper to leave the cell and conducted a "pat down" search of them as they left the cell. O'Connor was wearing only his underwear and shower shoes.

McGinley and Pfister started to sort through the belongings of the plaintiff and his cellmate.

McGinley pulled a box of books and papers out from under the bed and asked to whom they belonged. The plaintiff, who was standing with Cooper on the tier outside of the cell, responded that they were his property. As McGinley went through the contents of the box, he began placing a number of books, magazines, and musical cassette tapes in a brown bag on the floor near the door of the cell. Included in the items being confiscated were overdue books from the institution library, a "Prisoners Rights Manual," and some magazines which had been received by plaintiff in the mail and stamped by officials of the institution.

O'Connor complained that McGinley had no right to confiscate the material and started to enter the cell. McGinley told O'Connor that he was "over the limit of books" and if he had a complaint he could see the captain later. He ordered O'Connor out of the cell. O'Connor stepped back onto the tier, but became more agitated as McGinley continued to put books, magazines, and other articles into the bag. O'Connor reached into the cell and bent over to look into the bag. McGinley ordered O'Connor again to leave the cell, again told him that he was over the "book limit," and that if he had any questions he could take them up later. O'Connor, becoming more angry, stated that he had permission to have the books. McGinley responded that they were going to be confiscated and that O'Connor could discuss it later with the captain. O'Connor continued to protest and shouted angrily that McGinley had no right to take the materials. In the meantime, Pfister was examining belongings of Cooper. As O'Connor continued his oral torrent, McGinley became exasperated and indicated that he was going to take O'Connor "around back" to the "Back Keys" area where the office of the captain of the guard was located. McGinley moved toward O'Connor who gave no indication of agreeing to go at that time. O'Connor said that he wanted to get his "DCR," referring to one of the Department of Corrections regulations relating to possessions which an inmate was allowed to have. McGinley, in a loud tone, told O'Connor to "move" to the "Back Keys" area and attempted to take O'Connor by the elbow. There was a pushing and shoving match at the door of the cell between McGinley and O'Connor. Pfister, seeing the struggle, moved to shove O'Connor away from McGinley.

In the meantime, the time had arrived when the inmates on the F–1 Tier and the G–1 Tier were normally allowed to leave their cells to enter the "Rec Hall" which served those two tiers. The switch to open the F–1 Tier cell doors had been hit by Officer Sweigert, assigned that night to the H–1 Tier. He had been requested to do so by the F–1 Tier officer, Richard L. Smallwood, who, in anticipation of the inmates being allowed out of their cells on the tier, had gone with Officer Strawderman up the F–1 Tier to keep the milling inmates away from any possessions of Cooper and O'Connor which might be in the process of being confiscated. As the inmates on the F–1 Tier started coming out of their cells, Smallwood attempted to keep them moving away from O'Connor, McGinley, and Pfister.

McGinley and Pfister intermittently shoved and followed O'Connor down the tier toward the hallway. O'Connor was protesting.

Officer Sweigert came out of the F–1 guard office where he had turned on the TV switch for the Rec Hall and saw O'Connor appear to push McGinley as they were moving down the F–1 Tier toward the hall. Sweigert immediately went back to the F–1 office and advised the "Back Keys" by telephone that there was a fight involving an officer in the F–1 Tier, that the grilles were open and that inmates were coming out of their cells. The situation was apparently one with grave potential consequences. Sweigert, after making the call, went back to the hall from the F–1 office. By this time O'Connor, who had stumbled or been shoved down the steps, was swinging his arms angrily in the hall. He saw McGinley strike O'Connor, and O'Connor then pushed Pfister into the grille in the hall at the end of the F–1 Tier. Sweigert grabbed O'Connor in a "full nelson," and Pfister grabbed O'Connor around the leg.

At that time McGinley went into the F–1 office, took off his glasses, and removed the mace container which he had been issued that night from his holster. He went back into the hall and sprayed a shot of mace in O'Connor's face. O'Connor was still struggling, and McGinley went back to the F–1 office to call the "Back Keys" area for help, at which time he was told that help was on the way. As he exited the F–1 office, McGinley saw Sweigert lying on the floor with blood on his head and Pfister shaking loose from O'Connor. At this time Officers James Fisher, Orlando Wachtell, and John Houck arrived from the "Back Keys" area.

While Pfister and McGinley helped Sweigert into the F–1 office to a chair, Houck and Fisher got O'Connor down on the floor on his stomach, and Wachtell placed handcuffs on his wrists behind his back. Although the F–1 Tier grille had been closed in the meantime, at least 40 or 50 inmates were milling around the area of the hallway and the Rec Hall during the incident.

Officer Arlie Schetrompf, who had arrived from the "Back Keys" area just as the handcuffs were placed on O'Connor, helped Houck, Wachtell, and Fisher escort O'Connor through the Rec Hall and the milling inmates to the rear of the institution where the "Back Keys" area is located. O'Connor was struggling the entire way.

Officers Jack Harne and Robert Anderson had been sent from the "Back Keys" area to help when the second call had come from the F–1 Tier. As they ran down the hall toward the F–1 Tier, they passed the group bringing O'Connor to the "Back Keys" area. When they got to the F–1 Tier, they found Sweigert sitting in the F–1 office and learned that everything was under control. They returned to the "Back Keys" area.

At about the same time, the Captain of the Guard, Harold E. Spickler, arrived at the F–1 office and saw Sweigert. He had Sweigert taken to the Infirmary and then arranged for him to go to the Hagerstown Hospital that night. Officers McGinley and Pfister both went to the Infirmary for treatment of minor injuries which they had received and they returned to the F–1 Tier to complete the cell search.

## II. *The "Back Keys" Area*

When O'Connor was brought to the "Back Keys" area, he was very agitated, angry, and was continuing to struggle and yell. One of the officers told Lt. Lawrence Mitchell that O'Connor had injured Officer Sweigert. It is not entirely clear what happened in the "Back Keys" area. O'Connor claims that Officer Keith M. Robinson slammed his head into a grille like a battering ram. He claims further that Mitchell, Officers James Fisher, Jack Harne, Arlie Schetrompf, John Houck, Robert C. Ander-

son, Jr., Keith M. Robinson, Shannon R. Showe, and Lt. William Shinham all participated in a merciless beating inflicted on him in the "Back Keys" area when his hands were cuffed behind his back. He claims that during the beating he urinated on himself and that Fisher, Mitchell, and Robinson rubbed his head in his urine on the floor. He further claims that, when he asked for the handcuffs to be loosened, Robinson said "I should have broke your arm, Nigger." O'Connor produced two witnesses, inmates at the time of the incident, who testified that they saw parts of the beating allegedly administered in the "Back Keys" area.

On the other hand, the defendants, of course, deny that any such beating took place. Officer Orlando Wachtell testified that he was sitting outside of the "Back Keys" area on the "standby bench" and did not hear any noises indicating that such a beating was going on. Officer Robinson declared that he was in the officers' dining room when the beating allegedly took place. The court is sure that emotions were high on both sides, but is unable to find by a preponderance of the evidence that the officers beat O'Connor at that time or used more force than was reasonably necessary under the circumstances to control him. It is true that he did end up on the floor of the "Back Keys" area, but there is a conflict as to whether he struggled free from the officers who were restraining him and slipped on the floor, or whether he was forced to the floor to restrain him, or whether he was beaten to the floor and thereafter kicked. Based upon all the evidence, the court cannot conclude that it is more likely true than not that he was beaten.

There are several aspects of the plaintiff's case which cause the court to doubt the truth of his story as to what occurred in the "Back Keys" area.

In the first place, O'Connor testified that Lt. Shinham was one of those who participated in the beating. The court is satisfied, however, that Lt. Shinham was not on duty on the night in question. His time card shows that he did not work on September 29 or 30, 1978. (DX 2).

Secondly, Joseph Edmondson testified that he was an inmate in the segregation area of D–2, across a large courtyard from the windows of the "Back Keys" area. He testified that he was looking out his cell window and saw O'Connor being beaten through the lighted windows of the "Back Keys" hall. The court went to the MCI on the evening of September 28, 1980, and examined the site in the presence of plaintiff's counsel, both from the cell in which Edmondson was located and from the "Back Keys" windows. Having made that physical examination of the area, the court thinks it very unlikely that Edmondson could possibly have seen what he claims to have seen. The court notes that Edmondson was transferred to the security unit in Cell 16 on October 3, 1978, two days after O'Connor was transferred to that same unit in Cell 6. Under the circumstances, the court cannot discount the likelihood that O'Connor and Edmondson fabricated the story at that time.

Thirdly, Robert Hill, also known as "Big Bear," testified that he saw O'Connor being beaten in the "Back Keys" area as he was on his rounds collecting uniforms. Hill, an inmate at the time, had been released by the time of the trial. An affidavit filed in the case on behalf of the plaintiff indicates that Hill and Edmondson were friends. Hill testified that he saw Officer McGinley escorting O'Connor to the "Back Keys" area and that he saw McGinley participating in the beating and macing of O'Connor in the "Back Keys" area itself. O'Connor, on the other hand, did not testify that Officer McGinley was in the "Back Keys" area during the beating, and the court finds as a fact that Officer McGinley was not in that area at any of the relevant times that evening. Furthermore, O'Connor did not testify that he was "maced" in the "Back Keys" area.

Hill also testified that Officer Schetrompf told Hill, after O'Connor had been taken upstairs to the Isolation Cell area, to come into the "Back Keys" area and asked him "Do you want your face run into the grille also?" Since O'Connor testified, and the court finds as a fact, that Officer Schetrompf was one of those who took him up to the I.C. area, it is unlikely that Schetrompf was then in the "Back Keys" area to make the statement that Hill ascribes to him.

### III. *The Isolation Cell*

When Lt. Mitchell saw O'Connor struggling in the "Back Keys" area, and heard that an officer had been injured in the F–1 Tier area, he ordered O'Connor to be placed in the Isolated Confinement (hereinafter referred to as "IC") section at MCI for a cooling off period under the provisions of DCR 110–4. Pursuant to that DCR, an inmate could be placed in an isolated confinement cell if he was emotionally disruptive until such time as he had cooled off. Officers Harne, Schetrompf, Houck, Anderson, Robinson, and Showe were ordered to accompany him with the plaintiff to the IC area. The testimony showed that it was the practice of the correctional officers at MCI, if possible, to have a large number of officers accompany a disruptive inmate in a show of force to attempt to forestall any aggressive behavior by the inmate.

Still handcuffed, and protesting vigorously, O'Connor was taken to the IC area, which is located on the second floor of MCI above the "Back Keys" area. They entered the dressing room of the IC area, which contains lockers where the clothing of inmates and other inmate property would be stored prior to the inmate being placed in an IC cell. The cells had doors which opened into the dressing room area.

O'Connor's handcuffs were removed by Officer Anderson. Mitchell ordered O'Connor to remove his clothing since inmates in the IC area were given institutional jumpsuits to wear while confined to an IC cell. O'Connor refused to remove the clothing at which time several of the officers moved toward him to remove his clothing. Officer Anderson grabbed O'Connor in a "bear hug." Robinson attempted to hold O'Connor's arms. Officer Showe, who attempted to grab O'Connor's legs, was kicked. O'Connor fell to the floor on top of Anderson whose wrist was fractured in the process. Officer Schetrompf applied a short burst of mace to O'Connor in an attempt to

control him. As Anderson, Robinson, and Schetrompf held O'Connor on the floor, Officers Houck and Harne removed his clothing.

Lt. Mitchell told O'Connor to go to an end of the dressing room in which were located mattresses and blankets to pick up a mattress and blanket if he wanted one in the cell. O'Connor did not respond. Although O'Connor denies in his testimony that he refused a blanket and mattress, and, in fact, asserts that when he attempted to pick up a blanket and mattress in accordance with Mitchell's command, he was beaten by Anderson and Robinson, the court, while not, of course, being certain as to what happened, believes it more likely true than not that O'Connor simply failed to respond to Mitchell's command to pick up the mattress and blanket and was placed in the IC cell without them.

There was a conflict among the various participants in the incident as to whether or not O'Connor was offered an institutional jumpsuit at that time. All witnesses agree that he entered the IC cell naked, without a jumpsuit. Officer Harne made a notation on the one-half hour check form (PX 4) that O'Connor refused a mattress and blanket. No notation was made that he refused a jumpsuit, and the court finds that he was not offered a jumpsuit.

The isolation cell was a small, bare room with a concrete floor. It did not contain a bed, mattress, or blanket. However, the cell did contain a sink and a toilet.

Although it is standard procedure at the Institution when an inmate is placed into an IC cell to check to determine if plumbing fixtures are turned on, none of the officers involved in this incident testified that they remembered making such a check. According to Lt. Mitchell, the water for the sink and the toilet in an isolation cell is only turned off if an inmate breaks the plumbing facilities or floods the cell with water, in which event the inmate is moved to a new isolation cell and the water is turned off except for periodic four to five-minute intervals.

O'Connor testified that there was no running water in the cell in which he was placed and that he used dirty water in the toilet to wash the mace off his face and out of his eyes. He did not testify that the water in the cell was ever turned on during his entire stay in the isolation cell.

The institutional policy required that a check be made of the condition of an inmate in an isolation cell every one-half hour and that the shift commander or his deputy view an inmate so confined at least once every shift. Although present institutional policy requires that a report be made to the Superintendent or the Assistant Superintendent if a person is kept in isolation more than 24 hours, no such policy existed in September, 1978.

Plaintiff's Exhibit 4 demonstrates that O'Connor was seen every half hour by an officer on September 29 and September 30, 1978, and on October 1, 1978, with the exception of the period of 4 p. m. and 4:30 p. m. on October 1. A Shift Commander or Supervisor saw him during every shift except the 8 a. m. to 4 p. m. shift on October 1 and the 4 p. m. to 12 p. m. shift on that same date. O'Connor was released from the isolation cell at 8:30 p. m. on October 1, 1978, before the termination of that latter shift.

Other than the testimony of O'Connor himself, there is no evidence that he complained during that period in the isolation cell that the plumbing did not work, that the water was turned off, or that he wanted medical attention. Considering all of the evidence, the court is unable to conclude that the plaintiff has shown that it is more likely true than not that the water was shut off in the isolation cell during the period that he was confined therein.

On the early morning of September 30, O'Connor was given a jumpsuit by a guard at his request. He still did not have a mattress or blanket, and he had no toilet paper in the cell.

Plaintiff was released from the IC cell on October 1, 1978, at 8:30 p. m. and placed in a cell in the security unit pending Adjustment Team action.

## IV. *The Security Unit*

On Sunday, October 1, 1978, at approximately 8:30 p. m., plaintiff was transferred from the Isolation Cell to the Security Unit (Cell 6) on a separate tier at the Institution (PX 3). His release from IC was apparently authorized by Major Shives who seemingly replaced Captain Spickler on that shift that night (PX 5).

He was escorted to the "Back Keys" area by Officers Pfister and Showe where, in front of Officer J. W. Shifler, he refused to sign the form which Officer McGinley had filled out on September 29, returning the items which had been confiscated (DX 3).

O'Connor was then escorted by Pfister and Showe to the F–1 Tier to gather his belongings and from there he was taken to the Security Unit.

On October 3, 1978, O'Connor appeared before an Adjustment Team in connection with the Incident Reports that had been filed against him. The Incident Reports, which he had refused to sign the notices of before J. W. Shifler on October 1, 1978, related to the confiscated material, designated "Incident A," and to his alleged assaultive behavior, designated "Incident B" (DX 1). On that date, O'Connor requested that all eleven of the officers who had filed reports in connection with Incident B be required to testify and that he be given a copy of each of the incident reports. The hearing was postponed.

On that same day, he was taken to the Institution hospital for X rays of his skull and hands (PX 6B).

On October 5, 1978, O'Connor again appeared before the Adjustment Team and was allowed to read all of the reports. He requested that the reporting officers and 17 inmate witnesses be called to testify. The matter was postponed again.

On October 10, the Adjustment Team met with the inmate representative of O'Connor to discuss the hearing.

On October 11, 1978, O'Connor was taken to the MCI hospital for an X ray of his ribs (PX 6C).

On October 27, 1978, the Adjustment Team held a hearing. The Team directed that the property of O'Connor which had allegedly been confiscated, consisting of nine cassette tapes and 12 paperback books, should be sent to O'Connor's home by mail at O'Connor's expense or by way of a visitor (DX 1). He apparently was found guilty of the assaults by the Adjustment Team and sentenced to 18 months segregation time (Paper 10, p.2, ¶ (c)).

After the Adjustment Team hearing on October 27, 1978, the plaintiff was seen by the nurse in the MCI hospital for a complaint of numbness of both hands, allegedly caused by handcuffs being placed on him too tightly on September 29, 1978. The nurse, who is the wife of Lt. Mitchell, noted that there was no visible evidence of injury and that O'Connor stated that he had full use of his hands (PX 6D).

On November 14, 1978, O'Connor was again taken to the MCI hospital, complaining of numbness of his hands, and a notation was made that he would see the doctor later (PX 6E). On November 17, he was seen by Dr. Patalinghug who noted as follows:

This inmate claimed the handcuff placed on his wrist last September caused his fingers to feel numb. Examination revealed no evidence of external injury noted during exam. Finger movements were normal. Treatment as moist heat . . . and aspirin or Tylenol PRN (PX 6A).

Although O'Connor claims that he told the doctor at that time that he had headaches and difficulty with eye movement and that his knee or back hurt, the doctor's report does not reflect such complaints.

Although O'Connor also claims that he saw Nurse Mitchell at the MCI hospital on October 5, after his meeting with the Adjustment Team, and complained to her that he had cuts, scrapes, numbness in the wrists, swollen wrists, an infected toe, headaches, and difficulties with his eye movement, no record was produced by the plaintiff or defendants of any such visit. According to O'Connor, Officer Showe, who escorted him to the hospital area on that occasion, and Nurse Mitchell laughed when he described his symptoms and that she gave him a couple of aspirin.

O'Connor testified, without contradiction, that he was kept in the Security Unit from October 1, 1978, until his transfer to the Maryland Penitentiary in mid-December. He also testified, without contradiction, that he was on "deadlock" status until his hearing on October 27, and was not allowed out of his cell except for showers, his appearances before the Adjustment Team, and the previously mentioned medical or X-ray examination.

According to the plaintiff, he wrote a letter to Gerald Keller, Superintendent of MCI, on October 3, and again on October 10, complaining of his alleged beatings and requesting medical attention. Keller denied receiving any such letters. Keller testified that his secretary kept a log of all incoming correspondence to his office and the disposition of it. The log, which was introduced in evidence as Defendants' Exhibit 42, is a chronologically arranged one. No letters appear thereon from O'Connor as having been received between the dates of September 21, 1978 and November 1, 1978. While it is possible that O'Connor wrote such letters to Keller, the court is unable to conclude that he received them. O'Connor did not testify as to the method which he attempted to use to have the letters delivered to Superintendent Keller. There is no basis on which the court can conclude that any of the defendants prevented the letters from reaching Superintendent Keller.

Apparently plaintiff or his inmate representatives complained to the Adjustment Team during their various appearances before it that O'Connor had injuries which necessitated treatment, since his trips to the hospital area roughly coincided with the Adjustment Team meetings. There could have been many explanations for O'Connor's asking for medical attention only before the Adjustment Team, but the court will not speculate as to those reasons. Suffice it to say that there is no evidence that any of the defendants in this case were told by O'Connor during his stay in the Security Unit that he needed medical attention and that they, or anyone pursuant to their direction, ignored his requests.

O'Connor testified that he was allowed to see his inmate representatives while he was in the Security Unit prior to his hearing before the Adjustment Team on October 27, 1978. Although his originally chosen inmate representative, inmate Baker, was not allowed to represent him at the hearing since Baker had himself been placed on segregation, his second choice, inmate Ingram, with whom O'Connor was allowed to meet, did represent O'Connor at the hearing. The evidence presented before this court did not demonstrate any significant prejudice to O'Connor as a result of those circumstances.

### CONCLUSIONS OF LAW

In *Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court identified four general principles relevant to prisoner challenges to the conditions of their confinement. First, "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." 441 U.S. at 545, 99 S.Ct. at 1877. Second, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." 441 U.S. at 545–46, 99 S.Ct. at 1877–78, *quoting Price v. Johnston*, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356 (1948). Third, "maintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of [prisoners'] retained constitutional rights." 441 U.S. at 546, 99 S.Ct. at 1877. Finally, since "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions," prison officials are accorded deference "in the adoption and execution of policies and practices . . . needed to preserve internal order and discipline." 441 U.S. at 547, 99 S.Ct. at 1878.

However, while "there must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution," *Wolff v. McDonnell*, 418 U.S. 539, 556, 94 S.Ct. 2963, 2974, 41 L.Ed.2d 935 (1974), "a policy of judicial restraint cannot encompass any failure to take cognizance of

valid constitutional claims." *Procunier v. Martinez*, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974).

If a prisoner establishes a constitutional violation, prison officials sued in their individual capacity may be entitled to qualified immunity. *Procunier v. Navarette*, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). The defense of qualified immunity has both an objective and a subjective "good faith" component. The defense is not available if, in view of all the surrounding circumstances known to a defendant, *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1691–92, 40 L.Ed.2d 90 (1974), he either: (1) "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the [prisoner's] constitutional rights," or (2), acted "with the malicious intention to cause a deprivation of [the prisoner's] constitutional rights." *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Further, qualified immunity is an affirmative defense with the defendant who asserts it having the burden of proof. *McCray v. Burrell*, 516 F.2d 357, 370 (4th Cir. 1975) (en banc), *cert. dismissed*, 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976).

I. *The Cell Search and Confiscation of Personal Property*

The court has found that on September 29, 1978, defendants McGinley and Pfister conducted a search of plaintiff's cell on the F–1 Tier. The purpose of the search was to look for sandpaper. During the search, defendant McGinley confiscated a number of books, musical cassette tapes, and institutionally approved magazines belonging to plaintiff. Included among the items seized was a "Prisoners' Rights Manual." The court has also found that when plaintiff objected to the confiscation defendant McGinley responded that plaintiff was "over the limit of books," and that he could discuss the matter with the captain at a later time. Plaintiff contends that defendant McGinley's actions in seizing these items of personal property violated his rights under the First, Fourth, and Fourteenth Amendments.

Although the Supreme Court has never squarely confronted the issue, *compare United States v. Edwards*, 415 U.S. 800, 808 n.9, 94 S.Ct. 1234, 1239 n.9, 39 L.Ed.2d 771 (1974) *with Lanza v. New York*, 370 U.S. 139, 143, 82 S.Ct. 1218, 1220, 8 L.Ed.2d 384 (1962), there is a substantial body of authority holding that convicted prisoners do retain limited privacy interests under the Fourth Amendment and the Fourteenth Amendment Due Process Clause in connection with unreasonable searches and unjustified confiscations of personal property by prison officials. *See, e. g., United States v. Lilly*, 576 F.2d 1240, 1244–47 (5th Cir. 1978); *United States v. Stumes*, 549 F.2d 831, 832 (8th Cir. 1977); *Bonner v. Coughlin*, 517 F.2d 1311, 1315–17 (7th Cir. 1975); *Steinberg v. Taylor*, 500 F.Supp. 477, 479–80 (D.Conn.1980); *Brown v. Hilton*, 492 F.Supp. 771, 774–75 (D.N.J.1980); *Saunders v. Packel*, 436 F.Supp. 618, 625–26 (E.D.Pa. 1977); *Thornton v. Redman*, 435 F.Supp. 876, 880–81 (D.Del.1977). Further, since one of the items confiscated was a "Prisoners' Rights Manual," the seizure also implicates plaintiff's right of access to legal materials, *see Bounds v. Smith*, 430 U.S. 817, 828–32, 97 S.Ct. 1491, 1498–1500, 52 L.Ed.2d 72 (1977), as well as his right to possess materials meriting First Amendment protection. *See Pell v. Procunier*, 417 U.S. 817, 822–23, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Pittman v. Hutto*, 594 F.2d 407, 410 (4th Cir. 1979). *See also Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125–33, 97 S.Ct. 2532, 2537–41, 53 L.Ed.2d 629 (1977).

The court need not decide in this case the full extent of the constitutional protections afforded convicted prisoners against unreasonable searches and confiscations. The court does conclude, however, that a prisoner has protectable privacy and property interests in items of personal property he legitimately possesses, and that these interests are infringed when prison officials seize such property in an unreasonable manner or without a legitimate justification. Once a prisoner has proven the confiscation of legitimately possessed property, the burden is on the prison officials to

establish the reasonableness of the seizure. *See, e. g., United States v. Lilly,* 576 F.2d at 1245; *Bonner v. Coughlin,* 517 F.2d at 1317.

In assessing the reasonableness of a search and seizure in the prison context, relevant factors include "the nature of the institution, the reason for and the scope of the search, the instructions and supervision given to those who carry out the search, [and] the means provided for the return of any mistakenly seized property." *Thornton v. Redman,* 435 F.Supp. at 881. Also to be considered are whether, in possessing the property, the prisoner has reasonably relied upon regulations promulgated for his guidance, and whether the seizing officer has followed such regulations. *See United States v. Caceres,* 440 U.S. 741, 752–53, 99 S.Ct. 1465, 1472, 59 L.Ed.2d 733 (1979).

The purpose of the search, to discover sandpaper, was a legitimate one. Nevertheless, defendant McGinley proceeded to confiscate most, if not all, of plaintiff's books, magazines, and cassette tapes. No reason was given to plaintiff other than he was over his "book limit."

Maryland Division of Correction Regulation (DCR) No. 220–6 (PX 10) establishes guidelines concerning an inmate's possession of personal property. Under Appendix 1 to DCR 220–6, plaintiff was entitled to possess eight books, plus an unspecified number of "Religious, Legal, [and] School" books. The Appendix further provides that subscription magazines and newspapers are permitted "as authorized by M.O." (Managing Officer), and it is silent as to the number of cassette tapes permitted to be in a cell.

Based on the evidence, it appears that plaintiff was legitimately in possession of the cassette tapes and the magazines. Additionally, since defendant McGinley's confiscation report, rather than itemizing them, identifies the confiscated books only as "12 paperback books," (PX 3), the court concludes that plaintiff was not over his book limit.

The court also concludes that plaintiff reasonably relied on the institution's rules regarding the possession of personal property. The Maryland Division of Correction "Inmates' Manual" encourages prisoners to familiarize themselves with the institution's rules (PX 11, at 27–29). Plaintiff was in fact aware of the personal property rules because during the cell search he wanted to get his copy of "the DCR" from the cell to show McGinley that he was entitled to possess the confiscated property.

The procedures applicable to cell searches are set out in DCR 110–8 (DX 35). Defendant McGinley failed to comply with this institutional directive in two important respects. First, his confiscation report did not sufficiently identify the seized property. Former Superintendent Keller testified that the books should have been listed by title, and DCR 110–8 itself requires that all items be "inventoried." The apparent purposes behind such a requirement include reducing the number of instances where non-contraband is seized, and enabling both prison officials and inmates to identify later property that has been confiscated during a cell search.

Second, defendant McGinley's confiscation report was not signed by two correctional officers, as was required by the DCR since it was not signed by plaintiff. The apparent purpose behind this rule is to ensure the accuracy of the confiscation report.

Based on all of the evidence, the court concludes that defendant McGinley's actions in confiscating plaintiff's personal property were unreasonable and without justification. As a corrections officer, defendant McGinley is chargeable with knowledge of both the prison's regulations and well settled constitutional principles. Nevertheless, he offered no reasonable explanation for his failure to follow prison rules or the wholesale confiscation of plaintiff's legitimately possessed property. None of the items seized were contraband *per se,* and there were no exigent circumstances that might have warranted the seizure of non-contraband items. Further, defendant McGinley arbitrarily rejected plaintiff's reasonable efforts to demonstrate that the property was possessed legitimately, and the confiscation report does not even mention the seizure of legal materials. Ac-

cordingly, the court holds that defendant McGinley violated plaintiff's rights under the First, Fourth, Sixth, and Fourteenth Amendments and is personally liable for any damages flowing therefrom.

## II. The Alleged Assaults

Plaintiff has alleged that he was assaulted and beaten by corrections officers in the F–1 Tier, the hallway adjacent to the F–1 Tier, the "Back Keys" area, and in the IC area. Based on the evidence produced at the trial, however, the court concludes that plaintiff has failed to establish a constitutional violation.

In *King v. Blankenship*, 636 F.2d 70 (4th Cir. 1980), the Fourth Circuit held that "the *unjustified* striking, beating, or infliction of bodily harm upon a prisoner gives rise to liability under 42 U.S.C. § 1983 on the part of the one who, under color of law, engages in such conduct *without just cause.*" (emphasis supplied). The court cautioned, however, that not every use of force gives rise to section 1983 liability; "the rule must be read with reference to the Eighth and Fourteenth Amendments and not state tort law." 636 F.2d at 72–73. *See Baker v. McCollan*, 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979); *Hall v. Tawney*, 621 F.2d 607, 612–13 (4th Cir. 1980).

To aid the district courts in identifying whether particular conduct results in section 1983 liability, the Fourth Circuit noted the following:

> In determining whether the constitutional line has been crossed, a court must look to such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of injury inflicted, and whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.

636 F.2d at 73, *quoting Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973).

Also to be considered in assessing the reasonableness of defendants' conduct is DCR 115–2 (PX 13), which authorizes the use of force "only after all reasonable non-forceful solutions have failed." Situations involving the use of force contemplated by DCR 115–2 are:

(1) In self-defense from an assault by an inmate

(2) In defense of third parties, such as another employee, another inmate, or a visitor

(3) To enforce institutional directives or rules when an inmate refuses to obey such rules and non-forceful methods have failed

(4) To prevent a commission of a crime, such as malicious destruction of State property or an institutional riot

(5) To prevent escape.

PX 13, at ¶ 4(b).

 In sum, although plaintiff would not be barred from recovering under section 1983 simply because his conduct was aggressive, *Ridley v. Leavitt*, 631 F.2d 358, 359 (4th Cir. 1980), he cannot prevail on his constitutional claim in the absence of proof of the use of excessive force without just cause.

### A. The F–1 Tier and Adjacent Hallway

Applying the factors identified in *King*, it is plain that the situation on the F–1 Tier reasonably occasioned the use of force to maintain discipline and order. Plaintiff was angry and vigorously protesting that McGinley had no right to confiscate his books. After plaintiff failed to respond to McGinley's instruction to move to the "Back Keys" area, a shoving match ensued near the cell door.

At this time, Sweigert had opened the F–1 Tier cell doors. Thus, during the altercation in front of plaintiff's cell, the other F–1 Tier inmates were coming out of their cells into the hall. While plaintiff was certainly pushed and shoved down the hallway, plaintiff was swinging his arms menacingly. Sweigert ended up on the floor with blood on his head and had to go to the infirmary. Further, there were 40 to 50 inmates milling about in the area during the incident. There was, therefore, a clear danger of the altercation spreading to the other inmates, and plaintiff showed no signs of accompa-

nying the officers to the "Back Keys" area without a struggle. Under these circumstances, the court concludes that the use of force by correctional officers on plaintiff's person, including the use of mace, was a reasonable response to a situation frought with grave dangers. *See, e. g., Spain v. Procunier*, 600 F.2d 189, 196 (9th Cir. 1979); *Donahue v. Maynard*, 437 F.Supp. 47, 49 (D.Kan.1977); *Collins v. Schoonfield*, 363 F.Supp. 1152, 1164–65 (D.Md.1973).

### B. The "Back Keys" Area

When plaintiff arrived at the "Back Keys" area, he was extremely agitated. He continued to yell at, and struggle with, the correctional officers. Although plaintiff was handcuffed, the court concludes that it was still reasonable to use some force to control plaintiff's demonstrably violent behavior. Officers had been injured, and a potentially grave situation on the F–1 Tier had been narrowly avoided. Force was justified, therefore, because "the threat of disorder or disobedience [had not] subsided." *Ridley v. Leavitt*, 631 F.2d at 360.

Plaintiff's evidence simply failed to establish the unjustified use of excessive force in the "Back Keys" area. Plaintiff had testified that Lt. Shinham was one of the guards that participated in the beating. Yet, it was established through competent evidence that Lt. Shinham was not on duty at the time of the alleged beating. Edmondson testified on behalf of plaintiff that he witnessed the beating from his cell window across from the "Back Keys" area. However, the court personally examined the view from Edmondson's cell window and concluded that it was highly unlikely, due to the physical arrangement of the prison, that Edmondson could have witnessed the alleged beating. Finally, Hill's testimony contained inaccuracies and was contradicted by other competent evidence. In sum, the court concludes that plaintiff has failed to establish as a fact, by a preponderance of the evidence, that he was beaten in the "Back Keys" area.

### C. The IC Area

What occurred in the IC dressing room area cannot be examined in the abstract. Emotions on both sides were running high, and there had been a serious disruption of prison order.

After plaintiff's handcuffs were taken off, he was instructed to remove his clothing so he could put on an institutional jumpsuit. Plaintiff refused and several officers moved toward him. This resulted in another altercation between plaintiff and the officers. Officer Anderson grabbed plaintiff in a "bear hug." Officer Showe was kicked by plaintiff when he attempted to grab plaintiff's legs. Plaintiff fell to the floor on top of Officer Anderson, whose wrist was fractured by the fall. At that point, Officer Schetrompf applied a short burst of mace. The officers then held plaintiff on the floor and removed his clothing.

In light of all the surrounding circumstances, the court concludes that the officers responded to plaintiff's refusal to obey a legitimate instruction with reasonable force. The fact that one short burst of mace was applied does not compel a different conclusion. Plaintiff's hands were free and he was not secured in a cell. Although several officers were present, plaintiff physically resisted efforts to have him remove his clothing. Additionally, the officers were aware of plaintiff's previously disruptive behavior, and mace was applied only after other solutions had been attempted. *Compare McCargo v. Mister*, 462 F.Supp. 813, 818–19 (D.Md.1978) (use of mace on inmate while in cell).

### III. The Isolation Cell

Plaintiff also contends that his rights under the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment were violated in that (1) he was arbitrarily confined in an isolation cell, and (2) the conditions and length of such confinement constituted cruel and unusual punishment.

Defendants do not dispute that prisoners are accorded constitutional protection against being subjected to wholly arbitrary treatment and living conditions rising to the level of cruel and unusual punishment.

*See, e. g., Kirby v. Blackledge,* 530 F.2d 583, 587 (4th Cir. 1976); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 859–61 (4th Cir. 1975) (en banc). They maintain, however, that the conditions under which plaintiff was confined do not amount to cruel and unusual punishment.

Under DCR 110–4 (PX 14), confinement in an isolation cell is appropriate "[o]nly when an inmate becomes emotionally disruptive." Further, an isolation cell is *"not to be used as a routine punishment."* (emphasis in original).

■ Lt. Mitchell was the officer who ordered plaintiff to be placed in an isolation cell. Lt. Mitchell did so because he saw plaintiff struggling in the "Back Keys" area, and he had heard that a corrections officer had been injured in the F–1 Tier area. Based on the above, Lt. Mitchell reasonably concluded that plaintiff was "emotionally disruptive." As the officer in charge, Lt. Mitchell had the authority under DCR 110–4 to order such confinement (PX 14). The court holds, therefore, that the decision to place plaintiff in an isolation cell did not amount to a due process deprivation. *See McCray v. Burrell,* 622 F.2d 705, 708 (4th Cir. 1980).

The conditions and length of plaintiff's confinement in the isolation cell, however, stand on a different footing. Considered as a whole, the court concludes that a constitutional violation has been established.

While confinement in an isolation cell does not itself work a constitutional deprivation, *see, e. g., Sweet v. South Carolina Department of Corrections,* 529 F.2d at 860–61, it "is a form of punishment subject to scrutiny under Eighth Amendment standards." *Hutto v. Finney,* 437 U.S. 678, 685, 98 S.Ct. 2565, 2570, 57 L.Ed.2d 522 (1978).

Conditions implicating Eighth Amendment rights are to be examined in connection with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958). Moreover, as the Supreme Court noted in *Hutto v. Finney, supra:*

The Eighth Amendment's ban on inflicting cruel and unusual punishments, made applicable to the States by the Fourteenth Amendment, "proscribe[s] more than physically barbarous punishments." *Estelle v. Gamble,* 429 U.S. 97, 102 [97 S.Ct. 285, 290, 50 L.Ed.2d 251]. It prohibits penalties that are grossly disproportionate to the offense, *Weems v. United States,* 217 U.S. 349, 367 [30 S.Ct. 544, 54 L.Ed. 793], as well as those that transgress today's "'broad and idealistic concepts of dignity, civilized standards, humanity, and decency.'" *Estelle v. Gamble, supra* [429 U.S.], at 102 [97 S.Ct. at 290], quoting *Jackson v. Bishop,* 404 F.2d 571, 579 (CA8 1968).

437 U.S. at 685, 98 S.Ct. at 2570.

On the evening of September 29, 1978, plaintiff was placed in an isolation cell; that is, a small, bare room with a concrete floor. The cell did not contain a bed, a mattress, or a blanket. The cell did contain a sink and a toilet. None of the correctional officers checked to see whether the fixtures were in good operating condition although it was institutional policy to do so.

Although blankets and mattresses were available in the isolation cell dressing room area, plaintiff was placed in the cell without them. Further, plaintiff was naked when placed into the cell, and was not offered a jumpsuit by the officers. At his request, plaintiff was provided with a jumpsuit on the morning of September 30, 1978. Nevertheless, plaintiff did not have a mattress, a blanket, or toilet paper during the entire period he was in isolation. Plaintiff was released from the isolation cell on October 1, 1978 at 8:30 p.m., and placed in a security unit cell. The total period of confinement in isolation was approximately 48 hours.

Defendants have not offered any reasonable explanation as to why plaintiff was not afforded basic human comforts. Although conceivably there might have been a good faith belief that plaintiff could have harmed himself or the plumbing fixtures, defendants have not offered any evidence to this effect. In any event, it is apparent that the cumulative effect of the physical aspects of plaintiff's confinement in isola-

tion come perilously close to amounting to cruel and unusual punishment. *See Kirby v. Blackledge*, 530 F.2d at 586–87; *McCray v. Burrell*, 516 F.2d at 369 & n.4. Moreover, when these physical conditions are considered in conjunction with certain administrative deficiencies it is clear that the constitutional line has been crossed.

DCR 110–4 provides that confinement in an isolation cell is to be "limited to a 'cooling off' period which will last as long as it takes for the inmate to calm down enough to be moved to a segregation area." (PX 14, at ¶ 4(a)(2)). Plaintiff was seen by an officer every half hour on September 29, September 30, and October 1, 1978, with the exception of the period between 4:00 p.m. and 4:30 p.m. on October 1, 1978. Plaintiff was seen by a Shift Commander or Supervisor during every shift except the 8:00 a.m. to 4:00 p.m. shift on October 1, 1978, and the 4:00 p.m. to 12:00 p.m. shift on that same date. Plaintiff was removed from isolation at 8:30 p.m. on October 1, 1978 before the end of the latter shift. (PX 4).

Former Superintendent Keller testified that the purpose of the routine half hour checks was to determine the mental or emotional state of the inmate to see whether he had "calmed down." The officers who performed the routine checks, however, simply noted "O.K." on the section of the isolation cell report labeled "condition." (PX 4). These officers testified that they thought the purpose of the routine checks was to determine the inmate's *physical* condition. It is also significant that plaintiff was not seen by a supervisor during the last twelve and one half hours of his period of confinement.

In light of the above, defendants have not shown that plaintiff's confinement in an isolation cell for approximately 48 hours, under the conditions previously set out, was reasonably necessary to achieve a legitimate institutional goal. Moreover, defendants cannot claim that plaintiff was emotionally unstable, or a danger to himself or others, for the whole 48 hours. DCR 110–4 requires that if such is the case, a psychologist or psychiatrist be contacted immediately and that such person should evaluate the inmate within 24 hours. (PX 14, at 24(c)).

Defendants presented no evidence that a psychologist or a psychiatrist was ever called to evaluate plaintiff.

Finally, under Institutional Directive No. 42 (PX 15), *see* DCR 1–3, an inmate is not to be confined in an isolation cell for longer than 24 hours without prior notification of the Superintendent or Assistant Superintendent. Although former Superintendent Keller testified that, in his opinion, this directive was superseded by DCR 110–4, the two are not mutually exclusive and the DCR does not expressly rescind the institutional directive. The court concludes, therefore, that Institutional Directive No. 42 was in effect at the time of plaintiff's confinement in isolation and that it was violated because neither the Superintendent nor the Assistant Superintendent were notified that plaintiff was to be kept in isolation in excess of 24 hours.

In sum, defendants have failed to demonstrate that the length and conditions of plaintiff's confinement in isolation bore a reasonable relationship to the purposes for which an inmate could be so held. *See Sweet v. South Carolina Department of Corrections*, 529 F.2d at 860–61; *McCray v. Burrell*, 516 F.2d at 368–69. Consequently, the court holds that the length and conditions of plaintiff's confinement in isolation violated his rights under the Eighth Amendment. The court also holds that good faith immunity is not available to those defendants who were responsible for plaintiff's confinement in isolation under the physical and temporal conditions set out above. *See McCray v. Burrell*, 622 F.2d at 706–08.

Defendants Spickler, Robinson, Harne, and Showe all checked on plaintiff while he was in the isolation cell, and they all noted that his condition was "O.K." (PX 4). None of these officers took steps to remedy the physical aspects of plaintiff's confinement, reported the conditions to a superior officer, or inquired as to whether plaintiff had "cooled off" sufficiently to be moved to segregation. They simply checked to see whether plaintiff had any visible physical injuries. Since these defendants actively

**1374**

participated in, or condoned by knowing acquiescence, plaintiff's confinement in isolation, they are liable under section 1983. *Hall v. Tawney,* 621 F.2d at 615.

 Although defendant Keller cannot be held liable under a *respondeat superior* theory, *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th Cir. 1977), he is accountable for his own negligent conduct amounting to a violation of plaintiff's constitutional rights, *Withers v. Levine,* 615 F.2d 158, 162 (4th Cir. 1980), or for his own failure properly to train and supervise officers in the use of isolation cells. *Davis v. Zahradnick,* 600 F.2d 458, 459 n.1 (4th Cir. 1979). *See, e. g., McClelland v. Facteau,* 610 F.2d 693, 697 (10th Cir. 1979); *Naughton v. Bevilacqua,* 605 F.2d 586, 589 (1st Cir. 1979); *Owens v. Haas,* 601 F.2d 1242, 1246 (2d Cir.), *cert. denied,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979).

As Superintendent of the institution, defendant Keller was under a positive legal duty "to supervise the government, discipline, and policy of his institution and to enforce all orders and regulations of the Department [of Corrections]." *Md.Code Ann.* Art. 27, § 682(b). Further, under DCR 1–3 defendant Keller was "responsible for compliance with the DCR's."

From the testimony presented at trial, it is apparent that none of the officers who checked on plaintiff's condition understood the proper purposes of isolated confinement under DCR 110–4. Without explanation, they permitted plaintiff to remain in isolation without certain basic human necessities. Since defendants produced no evidence to the contrary, and considering that every officer testified and acted in a similar fashion, the court must conclude that there was a failure to train and supervise these officers in the proper use of isolation cells. Defendant Keller, therefore, permitted the existence of a "pervasive [and unreasonable] risk of harm" to the inmates, *see Withers v. Levine,* 615 F.2d at 161, while he was under a positive legal duty to see that isolation cells were used in accordance with DCR 110–4, as well as basic constitutional principles. Although the occurrence of an isolated event does not give rise to supervi-

sory liability, *Orpiano v. Johnson,* 632 F.2d 1096, 1101 (4th Cir. 1980), the fact that every officer who testified did not understand the meaning of DCR 110–4 gives rise to the inference that there existed a pattern of improper use of isolation cells. This is highlighted by the fact that defendants attempted to persuade the court that what happened to plaintiff was neither unusual nor impermissible. Since no evidence was presented to rebut the inference that what happened to plaintiff was within the usual course of events at the institution, the court holds that defendant Keller was negligent in failing to enforce DCR 110–4, that he failed to train and supervise his subordinates in the proper use of isolation cells, and that he is liable under section 1983 because his omissions were a substantial factor in bringing about the violation of plaintiff's constitutional rights. Moreover, since defendant Keller reasonably should have known that such omissions would result in constitutional deprivations, he is not entitled to the defense of qualified immunity. *Wood v. Strickland,* 420 U.S. at 321, 95 S.Ct. at 1000.

### IV. *Plaintiff's Other Claims*

 Plaintiff's remaining claims concern his treatment while on segregation and in connection with his Adjustment Team hearing.

With respect to his confinement on segregation, plaintiff contends that he was denied the right to exercise and adequate medical treatment. Restrictions on an inmate's opportunity for exercise may, in certain circumstances, constitute cruel and unusual punishment. In determining whether the restrictions placed on plaintiff were "so onerously burdensome as to reach constitutional dimensions, courts must look at the totality of the circumstances, including the extent to which the restrictions adversely affect the mental or physical health of the inmate." *Clay v. Miller,* 626 F.2d 345, 347 (4th Cir. 1980). Although it appears that plaintiff's opportunities for exercise were limited while he was on segregation, plaintiff did not produce any evidence indicating

the extent of the restrictions, or that there was a detriment to his mental or physical health. As to plaintiff's claim of denial of adequate medical care, the evidence shows that none of the defendants exhibited "deliberate indifference to [plaintiff's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976).

Plaintiff has also failed to show a constitutional violation with respect to his Adjustment Team hearing. Plaintiff was afforded notice of the charges against him and was represented by an inmate representative. Plaintiff was given ample time to prepare and marshal facts in support of his defense. Moreover, plaintiff has introduced no evidence tending to indicate that any of the procedures followed by the Adjustment Team operated to his prejudice. *See Wolff v. McDonnell*, 418 U.S. at 563–64, 566–68, 94 S.Ct. at 2978, 2979–80.

## V. *Damages and Attorney's Fees*

■ Since plaintiff has established violations of his constitutional rights, the court must consider the issue of damages. Section 1983 comprehends the payment of compensatory damages for constitutional deprivations. *Carey v. Piphus*, 435 U.S. 247, 254–57, 98 S.Ct. 1042, 1047–48, 55 L.Ed.2d 252 (1978). Such damages may include amounts for a plaintiff's physical and psychic suffering, as well as amounts for deprivations of property and liberty. *See Jenkins v. Averett*, 424 F.2d 1228, 1233 (4th Cir. 1970). In addition, punitive or exemplary damages may be awarded for the purpose of deterring or punishing violations of constitutional rights. *See, e. g., Shillingford v. Holmes*, 634 F.2d 263, 266 (5th Cir. 1981); *Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060, 1067 (1st Cir. 1980). Such damages are available when a defendant's conduct was malicious, wanton, or in reckless disregard of a plaintiff's rights. *See, e. g., Haywood v. Ball*, 634 F.2d 740, 742 (4th Cir. 1980); *Silver v. Cormier*, 529 F.2d 161, 163 (10th Cir. 1976); *Paton v. La Prade*, 524 F.2d 862, 872 (3d Cir. 1975). *See also Stengel v. Belcher*, 522 F.2d 438, 444 n.4 (6th Cir. 1975).

■ The court has determined that plaintiff is entitled to a judgment against defendant McGinley in the amount of $50.00 as compensation for the unconstitutional seizure of his books, magazines, and cassette tapes. This amount is appropriate since it is not clear that plaintiff was deprived permanently of his property. Plaintiff is also entitled to compensatory damages from defendants Keller, Spickler, Robinson, Harne, and Showe, in connection with his confinement in the isolation cell, in the amount of $100.00 per day. Since plaintiff was confined for approximately 48 hours, his award shall be $200.00, with each defendant to be individually liable for one-fifth of this amount.

■ In its discretion, the court has also decided that plaintiff should be awarded $250.00 in punitive damages against defendant McGinley. While it is, of course, necessary that prison officials be free to conduct cell searches for legitimate institutional reasons, defendant McGinley's seizure of plaintiff's books, magazines, and cassette tapes was wholly without justification. Plaintiff legitimately possessed these items under DCR 220–6, and defendant McGinley acted in wanton disregard of plaintiff's rights under this regulation and fundamental constitutional principles. Further, defendant McGinley disregarded the requirements of DCR 110–8 and offered no reasonable explanation for such departure.

Finally, since it appears that plaintiff has prevailed within the meaning of 42 U.S.C. § 1988, plaintiff's counsel should submit a petition for an award of attorney's fees and costs. *See McManama v. Lukhard*, 616 F.2d 727, 729 (4th Cir. 1980).

For the reasons set out above, by a separate order, judgment shall be entered as follows:

1. For plaintiff, and against defendant McGinley, in the amount of $300.00;

2. For plaintiff, and against defendants Keller, Spickler, Robinson, Harne, and Showe in the amount of $200.00, each defendant to be liable for one-fifth of said amount;

3. Against plaintiff, and for defendants, in all other respects.